**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AUTO DRIVEAWAY FRANCHISE SYSTEMS, LLC, | |
| Plaintiff/Counter-Defendant, | No. 18 CV 4971 |
| v. | Judge Manish S. Shah |
| AUTO DRIVEAWAY RICHMOND, LLC, JEFFREY CORBETT, et al., | |
| Defendants/Counter-Plaintiffs. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Auto Driveaway Franchise Systems, LLC, and defendants Jeffrey Corbett and Auto Driveaway Richmond, LLC, entered into franchise agreements that granted Corbett and AD Richmond a limited right to use some of Auto Driveaway's intellectual property. Auto Driveaway alleges that Corbett and AD Richmond continued those agreements on a month-to-month basis after they expired. If true, defendants' more recent conduct might have violated the agreements' two-year non-compete provisions. Defendant Tactical Fleet—a new corporation formed in the wake of AD Richmond's separation from Auto Driveaway—says it does not belong in this court at all. All defendants move to dismiss eight counts in the First Amended Complaint for failure to state a claim, and Tactical Fleet moves to dismiss all of the counts against it for lack of personal jurisdiction.

## I. Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, although a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, the court need not do the same for legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Ashcroft*, 556 U.S. at 678, 80–82. The plaintiff must provide "more than labels" or "a formulaic recitation of a cause of action's elements," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562.

## II. Facts

Auto Driveaway provides vehicle transportation and shipping management services via franchised locations across the United States. *See* [86-2] at 8.[1] AD Richmond and Corbett contracted to operate three such franchises, [86-2]; [86-3]; [86-4], and, toward that end, signed franchise agreements that granted AD Richmond a limited right to use some of Auto Driveaway's intellectual property. *See, e.g.*, [86-3] §§ 2.1, 6. Corbett signed as guarantor. *See, e.g.*, [86-3] at 61.

Each agreement contained a provision stating that the "initial term" of the agreement "shall be three (3) years from the Effective Date," *see, e.g.*, [86-3] § 5.1, and that AD Richmond could "renew this Franchise for three (3) additional terms of five

---

[1] Bracketed numbers refer to entries on the district court docket.

(5) years," provided certain conditions were satisfied (e.g., AD Richmond provided written notice and executed a new franchise agreement). *See, e.g.*, [86-3] § 5.2. The Nashville Agreement had the latest effective date: February 1, 2013. [86-3] at 8.

Two of the agreements stated a five-year date range on their first page. [86-2] at 2; [86-3] at 2. For instance, the dates, "February 1, 2013 – January 31, 2018" appear on the first page of the Nashville Agreement in bold font, alongside a logo, the title, "FRANCHISE AGREEMENT between AUTO DRIVEAWAY FRANCHISE SYSTEMS, LLC and Auto Driveaway Richmond, LLC," and the words, "Nashville, TN CBSA" (all in bold font as well). [86-3] at 2. The First Amended Complaint alleges that all three agreements had five-year terms because all three offices (Richmond, Nashville and Cleveland) were pre-existing offices. *See* [86] ¶¶ 36, 38, 40.

The agreements also each contained integration clauses and covenants not to compete. *See, e.g.*, [86-3] §§ 12.2, 12.3, 19.4. According to the covenants, upon each agreement's termination, AD Richmond and all "Bound Parties" were precluded from "engag[ing], directly or indirectly, as an owner, operator, or in any managerial capacity, in any Competitive Business, at or within a fifty (50) mile radius of the former Franchised Territory or any other Territory with an Auto Driveaway Office." *See, e.g.*, [86-3] § 12.3. The agreements define "Bound Parties" to include all members of AD Richmond, *see, e.g.*, [86-3] § 12.1; [86] ¶ 2 (Corbett is allegedly AD Richmond's sole member), and define "Competitive Business" to mean "operating 'for-hire' motor carrier businesses operating as either a common carrier or a contract carrier or any

business which operates … a business that provides similar services and/or products as those offered by" Auto Driveaway. *See, e.g.*, [86-3] § 1.

AD Richmond and Auto Driveaway did not exchange written renewals at the end of the agreements' initial terms. [86] ¶¶ 47, 48. Nonetheless, Auto Driveaway says that AD Richmond and Corbett "extended the terms of the Franchise Agreements by agreement and continued their franchisor/franchisee relationship pursuant to" the terms of the original agreements, and that they did so on a month-to-month basis by acting as though the agreements had not expired. *Id.* ¶¶ 48, 49. To support this theory, Auto Driveaway alleges conduct that it says created an implied-in-fact agreement. For instance, it alleges that Corbett started an association for franchise business owners in January 2018, *id.* ¶ 50, and, as late as that August, was still telling others that he was operating under a month-to-month franchise agreement. [86] ¶ 53. In June 2018, while negotiating a non-disclosure agreement, AD Richmond and Corbett allegedly wrote that each of the franchise agreements "expired on January 31, 2018" and was "being continued on a month-to-month basis pending the finalization of a mutually acceptable First Renewal Franchise Agreement." [86] ¶ 52; [111] at 2. And up through September 29, 2018, AD Richmond allegedly presented itself as a franchisee, made payments to Auto Driveaway for annual franchise fees and monthly royalty fees, booked, moved, and stored Auto Driveaway's customers' vehicles, and used Auto Driveaway's licenses, insurance, intellectual property, operations manual, email addresses, and accounts. *Id.* ¶ 54.

Auto Driveaway alleges that it terminated the agreements on September 29, 2018. *Id.* ¶ 55. Auto Driveaway alleges that Corbett has sought to avoid the non-compete provisions by forming Tactical Fleet in order to engage in what would otherwise be prohibited conduct under the guise of a new corporate entity. *See* [86] ¶ 135. The First Amended Complaint alleges a number of facts that support this theory, too. For instance, shortly after it became known that Auto Driveaway and AD Richmond would be parting ways, Corbett allegedly told at least one AD Richmond employee that "even though Auto Driveaway was terminating the franchise agreements, he would branch out on his own, things would be business as usual, nothing would change" and he would "start putting everything in someone else's name." *Id.* ¶ 140. In addition, Auto Driveaway alleges that Corbett is still involved in the day-to-day operations of Tactical Fleet, *id.* ¶ 151, and that Tactical Fleet hired at least thirteen former AD Richmond employees (in addition to two of AD Richmond's drivers). [86] ¶¶ 142, 143.

The First Amended Complaint also alleges that Tactical Fleet completed paperwork showing it planned to engage in a business referred to as "Auth. For Hire," and that the cargo that Tactical Fleet plans to carry includes "General Freight," "Motor Vehicles," and "Drive/Tow Away," [86] ¶ 136; [86-19], and that Tactical Fleet's website described itself as a "full-service fleet management company" that provides an "innovative fleet assessment application tool" and "customized reporting options." *Id.* ¶ 141; [86-20].

Tactical Fleet disputes this characterization, and has submitted three affidavits to contest personal jurisdiction. According to Corbett's affidavit, Auto Driveaway transports and stores their client's vehicles, and hires drivers and detailers (and others) in order to provide that service, [130-3] ¶ 3, and AD Richmond used to provide "for-hire motor carrier options," and would occasionally provide individual divers to drive their clients' vehicles to their intended destination, *id.* ¶ 4, but neither Auto Driveaway nor AD Richmond have ever provided data management services. *Id.* ¶¶ 3, 4. Corbett also says he owned a 20% interest in Tactical Fleet and was its CEO for approximately six weeks in the fall of 2018, [130-3] ¶ 5, and that, during that time, Tactical Fleet had no clients and was focused on administrative preparations, such as setting up payroll. *Id.* ¶ 6.

Warhurst, AD Richmond's former Director of Personnel, says she took over as CEO of Tactical Fleet in October 2018 and now owns a 70% membership interest. [130-1] ¶¶ 2, 4, 5. She agrees with Corbett's characterizations of Auto Driveaway and AD Richmond, *id.* ¶ 7, and says that Tactical Fleet is providing "data management services" such as "assisting clients with maintaining accurate data concerning their vehicles." [130-1] ¶ 14; *see also* [130-2] ¶¶ 5, 6, 8 (Brian Smith, the Chief Operating Officer of Tactical Fleet, corroborates this description). Warhurst says Tactical Fleet hired seventeen former AD Richmond employees, [130-1] ¶ 10, and purchased $16,000 worth of "furniture, fixtures and equipment" from AD Richmond once AD Richmond ceased operations (but did not assume any of AD Richmond's contracts). *Id.* ¶¶ 32, 33.

Warhurst says that, at first, Tactical Fleet was providing "trucking services for non-operating or disabled vehicles" in order to generate cash, and was using one of the same websites that Auto Driveaway uses (Central Dispatch) to locate clients. [130-1] ¶¶ 24, 25. Since January 2019, however, Warhurst says that Tactical Fleet has been selling its trucks and trailers and no longer moves vehicles. [130-1] ¶ 26. She adds that Corbett has been removed from Tactical Fleet's bank accounts and health insurance, [130-1] ¶ 29, and is no longer involved in the daily operations of the business. [130-1] ¶ 10. According to her, Tactical Fleet does not have an office or any employees in Illinois, has not advertised in Illinois or conducted any business in Illinois, and maintains its business records, complies with corporate formalities, and does not comingle assets or funds with other entities. [130-1] ¶¶ 27, 31, 34–38.

In response, Auto Driveaway has submitted an affidavit from Rodney Ruth, Auto Driveaway's CEO. [145-1] ¶ 1. Ruth avers that one of Auto Driveaway's drivers said he had "been hired by Tactical Fleet as a full time driver," [145-1] ¶ 5, and that another "gave notice that he was going to drive for Tactical Fleet in California." [145-1] ¶ 6. He says that Tactical Fleet was once registered at the same address as AD Richmond's old offices (but is now located ten miles from that office). *Id*. ¶¶ 7–9.

He has also attached screenshots from what purport to be Facebook posts tending to suggest that Corbett and Warhurst are now married. *See* [140-1] at 50–53. Other images purport to show that, in November 2018, Tactical Fleet wrote that it was "transporting our clients' vehicles both locally and Nationwide." [145-1] ¶ 12; [145-1] at 36. He has also attached copies of reports from Central Dispatch that

suggest users of that website were giving Tactical Fleet positive ratings until at least the middle of February 2019. [145-1] ¶ 13, 14; [145-1] at 40, 42, 43. Tactical Fleet had a booth at the National Association of Fleet Administrator's Fleet Management Expo in April 2019, [145-1] ¶ 21; [145-1] at 59, and based on photographs that show Corbett arriving outside (but not going inside) Tactical Fleet's offices, *see* [145-1] 54, 56, 57, Ruth believes he is still involved in day-to-day operation and management of Tactical Fleet. [145-1] ¶¶ 18–20.

## III.   Analysis

Auto Driveaway alleges that Corbett, AD Richmond, and Tactical Fleet breached the franchise agreements by, among other things, using Auto Driveaway's intellectual property in an unauthorized manner and failing to abide by the agreements' post-termination obligations (Counts V and X). [86] ¶¶ 209–215, 242–248. It also brings claims against Corbett, AD Richmond and InnovAuto for trademark infringement under the Lanham Act (Counts I, III and IV), [86] ¶¶ 156–169, 181–208, and the common law (Count II), [86] ¶¶ 170–180, a claim against Corbett for breach of the personal guaranty (Count VI), [86] ¶¶ 216–220, and a claim against all defendants seeking a declaratory judgment that Auto Driveaway owns certain technology (Count VIII). [86] ¶¶ 230–237. Defendants move to dismiss these portions of the First Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), [121], and Tactical Fleet moves to dismiss

all claims against it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). [129].

### A. The Trademark Claims

The First Amended Complaint alleges that the defendants' right to use Auto Driveaway's marks derived from the franchise agreements. [86] ¶¶ 159, 172, 183, 197. The defendants say that Auto Driveaway's trademark-based claims depend on the existence of an enforceable agreement, [122] at 6, 8, but that's not quite right; the claims depend in part on a finding that the agreements were either violated or terminated—otherwise, the use would have been authorized. There is no dispute that the agreements ceased being effective at some point, and the trademark allegations are phrased broadly enough to include conduct that took place at times that fell outside of the agreements' effective dates. For example, whether the agreements terminated in January 2016 (as defendants argue, [11] at 9) or September 2018 (as Auto Driveaway alleges, [86] ¶ 55), the First Amended Complaint says that defendants may have been continuing to use the marks up through December 2018. *See, e.g.,* [86] ¶¶ 162, 174, 185, 199. *See also* [86] ¶ 83 (alleging that defendants displayed one of Auto Driveaway's marks in June of 2018). In any event, the First Amended Complaint also alleges that, at some point, AD Richmond violated the agreements and, as a result, lost its limited right to display the marks. *See id.* ¶¶ 160, 173, 184, 198. It is plausible that point came before at least some of the unauthorized displays alleged in the complaint. *See, e.g.,* [86] ¶ 83. Defendants' motion to dismiss Counts I, II, III, and IV is denied.

### B.     The Breach of Contract Claims

An initial question—one left mostly unaddressed by the parties—is which state's laws governs the interpretation of the agreements. The forum state's choice-of-law principles apply when, as here, a federal court is exercising supplemental jurisdiction over state law claims. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). Illinois choice-of-law principles hold that when there is no outcome-determinative conflict between Illinois law and the law of the other state, Illinois law governs. *See McGrew v. Pearlman*, 304 Ill.App.3d 697, 701 (1st Dist. 1999).

Auto Driveaway says Illinois law governs the agreements, [136] at 3, and to the degree AD Richmond argues otherwise, it does so implicitly by occasionally citing Virginia's principles of contract interpretation. *See, e.g.*, [122] at 20, n.4. Parties can waive the choice of law issue by failing to assert it—at least when they "submit[] to Illinois law and rel[y] solely on it." *McCoy*, 760 at 684 (quoting *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009)).

Defendants rely on Virginia law in three places. In the first, defendants explicitly acknowledge that both Illinois and Virginia law are in accord. [122] at 15–16. In the second, they say that, under Virginia law, "mutuality of assents [sic] exists by an *interaction* between the parties, in the form of offer and acceptance, manifesting 'by word, act[,] or conduct which evince the intention of the parties to contract.'" [122] at 17 (quoting *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 290 Va. 36, 46 (2015)) (emphasis in original). Defendants cite no conflicting Illinois precedent, and

Illinois law is in accord. *Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill.App.2d 2, 13 (1st Dist. 1961) ("[t]he manifestation of mutual assent may be made wholly or partly by written or spoken words or by other acts or conduct").

In the third instance, defendants argue that, under Virginia law, when parties extend an express contract via their subsequent conduct, the terms of the agreement that result are limited to those which the parties' conduct has expressly recognized. [122] at 20 n.4 (citing *Spectra-4, LLP,* 290 Va. at 47). But *Spectra*'s holding was broader than that:

> In limited circumstances, an implied-in-fact contract may encompass the totality of an express contract simply by way of the parties acting in a manner consistent with such an express contract. But it is only when the parties to an express contract continue to act as if that contract is still operative even after it expires that the entirety of "the material terms of the prior contract ... survive intact" by way of a subsequently formed implied-in-fact contract. [citations omitted]. ... [W]hen the same parties are engaged in the same course of dealing both during and after the expiration of the express contract. *Absent such circumstances*, an implied-in-fact contract may include only the particular terms of a previously expired express contract which the parties' subsequent actions, embodying their mutuality of assent, specifically encompass.

*Spectra-4, LLP*, 290 Va. at 47 (emphasis added). Again, the defendants cite no conflicting Illinois law, and Illinois courts follow a similar rule. *See Kohlenbrener v. N. Suburban Clinic, Ltd.*, 356 Ill.App.3d 414, 419 (1st Dist. 2005) (when attorney continued operating under the terms of a fee arrangement with his former client's widow, in the absence of any manifestation of contrary intent, the court found an implied-in-fact contract between the widow and the attorney "to extend the terms of

her husband's agreement to the representation they provided for her"). Illinois law governs the interpretation of the agreements.

The date ranges on the first page of the agreement should not be ignored. Under the four corners rule, "a court initially looks to the language of a contract alone." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999). But neither party has cited any authority suggesting that an agreement's first page lies beyond its "four corners." Similarly, § 19.7 of the agreements says that the "table of contents, headings, and captions are for convenience and reference only," but that section says nothing about first pages. [86-3] at 42. If anything, the date ranges on the first page are better indicators of the parties' intent because—unlike most of the agreements' other terms—they appear to have been modified to address Auto Driveaway's unique relationship with AD Richmond. In similar instances, courts infer that modified portions of a form agreement better reflect the parties' intent. *See Djomlija v. Urban*, 107 Ill.App.3d 960, 964 (1st Dist. 1982) ("where there is conflict in a contract between handwritten and typed or printed terms, the handwritten terms will be deemed controlling"); *City of Chicago v. Weir*, 165 Ill. 582, 589 (1897) ("where a printed form is used to be filled up by writing, the written part will control in the construction of the contract").

Language in a contract is ambiguous if it is "susceptible to more than one meaning," *Air Safety, Inc.*, 185 Ill.2d at 462, and whether a contract is ambiguous is a question of law. *RBS Citizens, Nat. Ass'n v. RTG-Oak Lawn, LLC*, 407 Ill.App.3d 183, 189 (1st Dist. 2011). The language at issue here is not "susceptible to more than

one meaning" so much as it is directly contradictory with itself; the date range on the front page of the agreement indicates that the agreements were to last for five years, and a later section indicates that the agreements were to last for three. "[W]here two clauses conflict, it is the duty of the court to determine which of the two clauses most clearly expresses the chief object and purpose of the contract." *Harris Tr. & Sav. Bank v. Hirsch*, 112 Ill.App.3d 895, 900 (1st Dist. 1983). In such cases, the parties' conduct is the "strongest evidence" of their intention, and extrinsic evidence is properly considered. *Id.* AD Richmond and Corbett allegedly continued making payments, communicating with others, and using Auto Driveaway's intellectual property as though the agreements had not expired. The defendants even allegedly wrote to Auto Driveaway that they, too, believed the agreements had lasted for five years. It would be improper to decide the issue as a matter of law. *See Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992) ("[i]f the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a [court] cannot properly determine on a motion to dismiss").[2]

---

[2] Other principles of contract interpretation do not compel a different result. First, "where both a general and a specific provision in a contract address the same subject, the more specific clause controls." *Grevas v. U.S. Fid. & Guar. Co.*, 152 Ill.2d 407, 411 (1992). The problem here is that both provisions are equally broad; neither contains limiting language that suggests it describes some subset of obligations. And while "[t]he obligations and promises of the parties in the operative portion of a contract prevail over a preliminary recital or preamble," *Cress v. Recreation Servs., Inc.*, 341 Ill.App.3d 149, 170 (2nd Dist. 2003), the date ranges are not part of a recitation of the facts that led the parties to contract or a statement of the parties' intent; they appear instead to be operative terms themselves. And while it is true that "any ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision," *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 479 (1998), it is not a foregone conclusion that Auto Driveaway drafted both of the provisions at issue. Auto Driveaway appears to have drafted the majority of the agreement, *see, e.g.*, [86-3] at 8 (referring to Auto Driveaway as "us"), and there may be reason to believe it also drafted the

Nor does the presence of an integration clause decide the issue. Normally, extrinsic evidence is inadmissible to vary the terms of an integrated agreement. *Air Safety, Inc.*, 185 Ill.2d at 464–65. But integration clauses do not prohibit the consideration of extrinsic evidence when the contract is ambiguous. *Asset Recovery Contracting, LLC v. Walsh Const. Co. of Illinois,* 2012 IL App (1st) 101226, ¶ 71.

If the agreements ran for five years, the last of them to expire (the Nashville agreement) would have expired on January 31, 2018, meaning the non-compete provisions would have applied through January 30, 2020. In that case, some of the conduct that Auto Driveaway describes in the complaint could plausibly constitute a breach of those provisions. Even without an implied-in-fact theory, Auto Driveaway has stated a claim for breach of contract. AD Richmond and Corbett's motion to dismiss is denied insofar as it addresses Count X of the First Amended Complaint.[3]

Auto Driveaway's First Amended Complaint would survive even if the agreements had three-year initial terms. Illinois law recognizes implied-in-fact-agreements; they are those "in which a contractual duty is imposed by a promissory expression which may be inferred from the facts and circumstances and the expressions [on] the part of the promisor which show an intention to be bound."

---

first page. But at this point, all reasonable inferences must be drawn in Auto Driveaway's favor.

[3] Neither this conclusion nor any other contained herein is premised upon Auto Driveaway's success on its motion for a preliminary injunction. Such motions are governed by a different standard. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044, 1046 (7th Cir. 2017). At least with regard to all counts discussed in the briefing except Count VI, the First Amended Complaint contains a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2).

*Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 440 (7th Cir. 2011). *See also Lirtzman v. Fuqua Indus., Inc.,* 677 F.2d 548, 551 (7th Cir. 1982) ("An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.").

The First Amended Complaint alleges that such a contract exists. It commits no error by recognizing both an implied-in-fact contract and an express contract. "'[A]n implied contract cannot coexist with an express contract on the same subject,'" *id.* at 440 (quoting *Maness v. Santa Fe Park Enterprises, Inc.,* 298 Ill.App.3d 1014, 1022 (1st Dist. 1998)), but the franchise agreements did not "coexist" with the implied-in-fact agreements. The allegation is that the original agreements expired and, following their expiration, were "extended" and "continued" under a different, implied-in-fact agreement. [86] ¶ 48. Although the implied-in-fact agreement and the franchise agreements governed the same subject matter, they applied during different periods of time.

The agreements did require that certain conditions be met before AD Richmond would be allowed to renew them for additional five-year terms. But they say nothing about continuing the agreements for a different duration. And as Auto Driveaway points out, § 5.2 only says what AD Richmond has to do to renew the agreement without further input from Auto Driveaway; it does not prevent Auto Driveaway from agreeing to allow AD Richmond to renew the agreement by other

means. And at the very least, § 5.2 does not preclude the creation of a new agreement, pursuant to the same terms as the old agreements, after those agreements expired.

Defendants acknowledge the theory behind the First Amended Complaint, and even go so far as to agree with its basic premise. [122] at 15–16; *Foster v. Springfield Clinic*, 88 Ill.App.3d 459, 463 (4th Dist. 1980) ("It has been repeatedly held that, where one party enters the employment of another under a special contract fixing the time and price to be paid, and continues in such employment after the term has elapsed, it will be presumed that the hiring and service were under the original contract."). That general premise applies here. Defendants say that the new implied-in-fact agreement was really just a modification of the old franchise agreements, and that in order to modify an existing agreement, there must be "offer, acceptance, and consideration." *Schwinder v. Austin Bank of Chicago*, 348 Ill.App.3d 461, 468 (1st Dist. 2004). But Auto Driveaway has not alleged that the original agreement was modified and, even if they had, implied-in-fact agreements are themselves valid, original contracts, *Marcatante,* 657 F.3d at 440, and both offer and acceptance can be communicated by action. *See Lirtzman,* 677 F.2d at 551.[4] Defendants next argue that AD Richmond's counsel might have unilaterally accepted the terms of the new agreement. But a principal may delegate to an agent the authority to bind them in an agreement, *see Grillo v. Yeager Const.,* 387 Ill.App.3d 577, 590 (1st Dist. 2008);

---

[4] Defendants also point out that, in an Illinois court, "[i]f the acceptance of an offer is oral, then the specific facts supporting this theory of acceptance must be alleged" in order to survive a motion to dismiss. *Nuccio v. Chicago Commodities, Inc.*, 257 Ill.App.3d 437, 444 (1st Dist. 1993). "That may be the Illinois pleading rule," but that rule "does not apply in a federal court." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 926 (7th Cir. 2003).

*Patrick Eng'g, Inc. v. City of Naperville,* 2012 IL 113148, ¶ 36 ("an apparent agent may make representations the specifics of which the principal is unaware, and still bind the principal"), and "[n]ormally, whether an agency relationship exists is a question for the trier of fact." *Lydon v. Eagle Food Centers, Inc.*, 297 Ill.App.3d 90, 93 (2nd Dist. 1998).

Defendants request that I judicially notice a document not attached to the First Amended Complaint. A court may judicially notice matters that are in the public record, and may do so when an "undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). The problem is that the document is not a public record; it is a letter that Susan Meyer sent to Corbett and AD Richmond on November 22, 2017. [55-1] at 19–22. Defendants do not argue that this letter is referenced in the First Amended Complaint, or that the First Amended Complaint depends on it, and while the fact that the letter was written may be indisputable, it remains to be seen whether Meyer's statements are true. *See also Golden v. Foster,* No. 17-C-498, 2018 WL 4473354, at *4 (E.D. Wis. Sept. 17, 2018) ("Just because the documents on the court's electronic docket are filed does not mean they are 'generally known' or 'accurately readily determined.'"). I decline to judicially notice the letter. I reach the same conclusion regarding paragraphs of a declaration that Rodney Ruth submitted earlier in this litigation. [122] at 18. Those paragraphs suggest that Ruth thinks AD Richmond did not return any executed copies of new franchise agreements. [55-1] ¶¶ 21, 22, 29. But again, this document is not referenced

in the First Amended Complaint, the First Amended Complaint does not depend on it, the truth of Ruth's statement is not beyond dispute, and it is not a public record. Even if I had judicially noticed that statement, it is consistent with Auto Driveaway's legal theory.

Nor did the alleged month-to-month agreement violate the Illinois Franchise Disclosure Act. That Act prohibits a franchisor from "refus[ing] to renew a franchise of a franchised business located in this State without compensating the franchisee." 815 Ill. Comp. Stat. Ann. 705/20. Auto Driveaway has alleged that it was AD Richmond and Corbett that refused to renew the agreement, not Auto Driveaway, and none of the franchised locations are alleged to be located in Illinois.

The defendants also say that the fact that the parties negotiated leading up to the agreements' termination shows that the implied-in-fact agreement never came into existence. In support, they cite *Consol. Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224 (7th Cir. 1990). After Consolidated Bearings sent Ehret-Krohn a timely notice that they intended to terminate an automatically-renewing agreement, the parties began negotiating a new one. *Id.* at 1226. They continued doing business under the old agreement (even past its expiration date) until Consolidated Bearings eventually decided to terminate the relationship. *Id.* Ehret-Krohn argued that the initial termination notice was ineffective, *id.* at 1230, but the Seventh Circuit upheld the district court's grant of Consolidated Bearings' motion for a directed verdict, stating,

> [W]hen an employee continues working under a contract
> after its expiration, a presumption does arise that the

> contract is renewed. [citation omitted]. But evidence that the parties were negotiating a new contract rebuts the presumption by negating the inference that either party believed the contract had been renewed. [citation omitted]. Ehret objects that it did not negotiate with Consolidated about a new contract. Negotiations, however, are only evidence that a party is on notice that the contract will not be renewed; Consolidated gave Ehret written notice to the same effect.

*Id*. That is different than what is alleged here. The First Amended Complaint alleges that, while negotiating a non-disclosure agreement, the defendants wrote that each of the franchise agreements "expired on January 31, 2018" and was "being continued on a month-to-month basis." [86] ¶ 52. That is not an allegation that the parties were still negotiating the franchise agreements, it is evidence that the parties believed the franchise agreements were being continued while they negotiated a different agreement. Even if they had been negotiating, those negotiations would at best be evidence that Auto Driveaway was on notice that the franchise agreements would not be renewed. That evidence would not be enough to dismiss the First Amended Complaint, at least not without an allegation that Auto Driveaway sent a written notice of intent to not renew.

Defendants also say that any implied-in-fact agreement must be limited to those "particular terms of [the] previously expired express contract which the parties' subsequent actions … specifically encompass." [122] at 20 n.4 (citing *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 290 Va. 36, 46 (2015)). As discussed above, the quoted material omits an important portion of the Virginia Supreme Court's holding: "when the parties to an express contract continue to act as if that contract is still operative even after it expires," the "entirety of 'the material terms of the prior

contract ... survive intact.'" *Spectra-4, LLP*, 290 Va. at 47. That is what Auto Driveaway alleges, and that theory is supported not only by Virginia law, but by Illinois law, too. *See, e.g.*, *Kohlenbrener v. N. Suburban Clinic, Ltd.*, 356 Ill.App.3d 414, 415 (1st Dist. 2005).

The statute of frauds does not bar Auto Driveaway's claims. The statute of frauds is an affirmative defense, Fed. R. Civ. P. 8(c)(1), and a plaintiff is not required to plead around affirmative defenses. *Davis v. Indiana State Police*, 541 F.3d 760, 763 (7th Cir. 2008). Nor is the defense so plain from the face of the First Amended Complaint that the suit "can be regarded as frivolous." *Turley v. Gaetz,* 625 F.3d 1005, 1013 (7th Cir. 2010). The statute would apply only if the agreement could not be performed within the space of one year, 740 Ill. Comp. Stat. Ann. 80/1, and the parties could have agreed (and allegedly did agree) to a new one that included only one-month-long obligations and that renewed automatically. The two-year non-compete is no barrier, either, because "a covenant not to compete may be fully performed if the party bound by it dies within the year." *Wyatt v. Dishong*, 127 Ill.App.3d 716, 720–21 (5th Dist. 1984).[5] None of these arguments depend on the partial performance

---

[5] In reply, defendants argue that AD Richmond could not have fully performed its promise to not compete because it was not capable of dying in the same way as Corbett. [140] at 16. It cites no law in support of that argument, and there is no reason why a similar rule should not apply to corporations. *See* 9 Williston on Contracts § 24:5 (4th ed. 2019) ("A promise of permanent personal performance is, on a fair interpretation, a promise of performance for life, and therefore not within the statute by the majority view; and the same principle has been applied to promises of unlimited duration made by or to a corporation when performance of the promise is, by its nature, limited to the life of the corporation or the continuance of its business.")

exception (which does not apply because Auto Driveaway is seeking both equitable remedies and remedies at law). *See Cohn v. Checker Motors Corp.,* 233 Ill.App.3d 839, 845 (1st Dist. 1992) ("[a]lthough acts of partial performance are typically sufficient to take an oral agreement out from under the operation of the Statute of Frauds in an action at equity, such acts do not take an action at law outside the operation of the Statute of Frauds"); [86] ¶¶ 215(a)–(e).

Even if the statute did apply, a collection of writings can satisfy the statute if, "taken together, they contain the required information either on their face or by reference to other writings." *Cohen Dev. Co. v. JMJ Properties, Inc.,* 317 F.3d 729, 737 (7th Cir. 2003); *Ins. Co. v. Gen. & Cologne Life Re of Am.,* 424 F.3d 542, 549 (7th Cir. 2005). Even though one of the writings alleged to exist in the complaint (the draft non-disclosure agreement) was not signed, the underlying agreements were, *see Melrose Park Nat. Bank v. Carr,* 249 Ill.App.3d 9, 15–16 (1993) ("[a] writing sufficient to satisfy the Statute of Frauds need not itself be a valid contract, but only evidence of one"), and the First Amended Complaint does not foreclose the possibility of some other writing that satisfies the statute. Lastly, it is too early to apply the statute because the purpose of the statute is to "prevent fraud, not facilitate it." *Crawley v. Hathaway*, 309 Ill.App.3d 486, 491 (4th Dist. 1999). If AD Richmond and Corbett tricked Auto Driveaway into believing that the contract would continue, they would now be using the statute to commit a fraud, not prevent one. It is too early to know. AD Richmond and Corbett's motion to dismiss Count V is denied.

The motion to dismiss Corbett as guarantor, however, is granted. Corbett's obligations as guarantor were different. Even though he agreed to be personally bound by, and liable for the breach of, every provision in the underlying agreements, [86-3] at 60–61, a guarantor's liability "is strictly construed in his favor" and is "not to be varied or extended beyond its precise terms by construction or implication." *Lincoln Park Fed. Sav. & Loan Ass'n v. Carrane*, 192 Ill.App.3d 188, 191 (1st Dist. 1989); *Castle v. Powell*, 261 Ill. App. 132, 144 (1st Dist. 1931) ("nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended by implication beyond the terms of his contract"); *Peirce v. Conant*, 47 Ill.App.2d 294, 305 (1st Dist. 1964) (the guarantor is to be "bound only to the extent and in the manner and under the circumstances pointed out in his obligation and no further"). Auto Driveaway does not argue against this conclusion. Defendants' motion to dismiss Count VI is granted.

## C.   The Declaratory Judgment Claim

AD Richmond and Corbett have also moved to dismiss Count XIII of the First Amended Complaint. That count seeks a declaratory judgment that Auto Driveaway owns certain technology. [86] ¶¶ 230–237. AD Richmond and Corbett say this count "relies on the terms of the Franchise Agreements" and "cannot stand upon allegations of implied contract." [122] at 11, 24. But the agreements are limited to technology developed "during the[ir] term," [86-3] at 31, and AD Richmond and Corbett do not argue that the agreements were invalid *ab initio*. The First Amended Complaint plausibly alleges that some of the technology was developed during the term of the

original agreements, however long that term might have been. Count VIII is not dismissed.

### D. Personal Jurisdiction Over Tactical Fleet

Tactical Fleet has moved to dismiss the claims against it for lack of personal jurisdiction. [129]. Auto Driveaway carries the burden, but only needs to make out a *prima facie* case, *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003), and is entitled to have all disputes concerning the relevant facts resolved in its favor. *Weidner Communications, Inc. v. H.R.H. Prince Bandar Al Faisal*, 859 F.2d 1302, 1306 n.7 (7th Cir. 1988). Tactical Fleet does not challenge subject matter jurisdiction; the case arises under federal law, 28 U.S.C. § 1331, and supplemental jurisdiction extends to the remaining claims. 28 U.S.C. § 1367.

The law of the forum state governs the personal jurisdiction analysis because the Lanham Act does not have a "special federal rule for personal jurisdiction." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014), *as corrected* (May 12, 2014). Illinois's long-arm statute authorizes its courts to exercise jurisdiction "on any basis permitted by the Illinois and United States Constitutions." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000). The "meaning and scope" of Illinois's long-arm statute "does not fluctuate with every new pronouncement on the limits of Federal due process," *Rollins v. Ellwood*, 141 Ill.2d 244, 271 (1990); *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002), and is "likely more restrictive than its federal counterpart," *KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718,

732 (7th Cir. 2013), but there is often "no operative difference." *Hyatt Int'l Corp.*, 302 F.3d at 715; *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 757 (7th Cir. 2010). The crucial question is whether "the defendant should reasonably anticipate being haled into court in the forum State, because the defendant has purposefully availed itself of the privilege of conducting activities there." *Hemi Grp. LLC*, 622 F.3d at 757.

Personal jurisdiction can be either general or specific. "The threshold for general jurisdiction is high," *Tamburo v. Dworkin,* 601 F.3d 693, 701 (7th Cir. 2010), and neither party has argued that Tactical Fleet's contacts with Illinois meet that threshold. Specific personal jurisdiction exists when "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702. The defendant's contacts are assessed as of "the time of the events underlying the dispute." *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987); *Pohlmann v. Bil-Jax, Inc.*, 176 F.3d 1110, 1112 (8th Cir. 1999) (even though "the issue of personal jurisdiction turns on whether the trial court has jurisdiction over the person of a defendant at the time the suit is commenced," "[i]n some cases, resolving that issue requires findings as to the parties' contacts with the forum State 'at the time of the events underlying the dispute.'").

Auto Driveaway's theory is that Corbett is trying to duck this lawsuit and the preliminary injunction by forming a new entity in Virginia—Tactical Fleet, LLC—and using it to compete in ways that are prohibited by the franchise agreements.

According to Auto Driveaway, that makes Tactical Fleet a "successor alter ego" whose contacts with Illinois should be considered coextensive with AD Richmond's. [145] at 4. In its reply, Tactical Fleet does not challenge Auto Driveaway's characterization of the factors relevant to deciding whether there is specific personal jurisdiction over a successor alter-ego entity. *See* [146] at 5–6. Instead, it argues that those factors do not compel a finding of personal jurisdiction, and that one additional factor—fraudulent intent—is essential and lacking. *Id*.

Illinois law provides some support for this theory of jurisdiction. In *Maunder v. DeHavilland Aircraft of Canada, Ltd*., the Illinois Supreme Court suggested that Illinois courts may have general personal jurisdiction over a parent corporation based on the actions of its alter-ego subsidiary. 102 Ill. 2d 342, 353–354 (1984). But "piercing the corporate veil is a distinct analysis from the *Maunder* agency theory of jurisdiction," and the existence of personal jurisdiction does not turn on whether "the distinction of separate corporate identities has been blurred." *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.*, 389 Ill.App.3d 58, 66–67 (1st Dist. 2009). At the least, a showing of fraud or injustice is required. *Id*. at 71.

Federal cases have found that whether an entity is an alter ego is pertinent but not determinative: "that fact cannot alone confer personal jurisdiction." *Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 23 (7th Cir. 1977). *See also Great Lakes Overseas, Inc. v. Wah Kwong Shipping Grp., Ltd*., 990 F.2d 990, 996 (7th Cir. 1993) (applying alter-ego tests from both Illinois and English law to determine whether personal jurisdiction existed); *Daimler AG v. Bauman*, 571 U.S. 117, 134–35

(2014) (noting that "several Courts of Appeals have held[,] that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego").

However, when one entity has "chosen to stand in the shoes of its predecessor and has chosen to accept the business expectations of those who have dealt previously with that predecessor," it "can be expected to be haled into the same courts as its predecessor." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003). Relevant to this inquiry is whether the successor corporation purchased "all (or substantially all)" of the predecessor's assets, and whether the two entities merged. *Id.* at 785. Still, personal jurisdiction cannot be based on "corporate affiliation or stock ownership alone," at least not when formalities have been observed and there is no unusually high degree of control. *Cent. States*, 230 F.3d at 943.

Auto Driveaway has made out a prima facie case that Tactical Fleet should have reasonably anticipated being haled into court in Illinois.[6] Corbett was there when Tactical Fleet started and helped get it off the ground. The timing of Tactical Fleet's incorporation is important—it happened after Auto Driveaway filed the initial complaint, and before it filed the First Amended Complaint—and the similarity of

---

[6] In their reply brief, defendants raise two evidentiary objections. They move to strike as hearsay those portions of Ruth's declaration that purport to relay statements from drivers that Tactical Fleet allegedly hired. [146] at 4. The rule against hearsay applies, *see United Phosphorus, Ltd. v. Angus Chem. Co.*, No. 94 C 2078, 1996 WL 14036, at *1 (N.D. Ill. Jan. 11, 1996); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986); *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 506 (6th Cir. 2014); *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008), and I decline to consider those statements because they are out-of-court statements being introduced for their truth, and because they were not made within the scope of the drivers' relationships with Tactical Fleet. *See* Fed. R. Evid. 801(d)(2).

the services that Tactical Fleet provided (at least at the start), taken in combination with statements that Corbett intended to continue operating his business as before but under a new name, sufficiently suggest both Corbett and Tactical Fleet should have reasonably anticipated being haled into court in Illinois. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). In addition, Corbett appears to have a close personal and professional relationship with Tactical Fleet's new CEO, there is significant overlap between Tactical Fleet's current personnel and AD Richmond's former personnel, and, on top of all of that, Tactical Fleet purchased of some of AD Richmond's assets. *See Purdue Research*, 338 F.3d at 785 (no successor liability where, rather than regard defendant entity as a "mere continuation," it was "far more accurate" to regard them has having "purchased particular assets"). Tactical Fleet may or may not be Corbett's alter ego, and it may or may not have breached the underlying agreements, but it looks enough like AD Richmond's successor corporation that it would not offend "traditional notions of fair play and substantial justice" to require that it appear and answer the complaint. *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

This circumstantial evidence of fraudulent intent is sufficient. There is evidence in the record that Corbett formed Tactical Fleet in Virginia in the fall of 2018, and that he and his new spouse did so using many of AD Richmond's former employees and some of its assets shortly after a court order was entered that might otherwise have prevented him from continuing to operate AD Richmond as he had been before. Even though there is also evidence that Tactical Fleet is starting to offer

different services, and even though there is evidence that Corbett has stepped back from the day-to-day management, that is not enough; there is evidence that Corbett's intent was to continue business as usual by organizing a new entity and concealing his role in it. The basis for jurisdiction is clear enough from the record that additional discovery is not necessary. *Cent. States.*, 230 F.3d at 946; *Sullivan v. Sony Music Entm't*, No. 14 CV 731, 2014 WL 5473142, at *5 (N.D. Ill. Oct. 29, 2014). Tactical Fleet's motion to dismiss for lack of personal jurisdiction is denied.

## IV. Conclusion

Defendants' motion to dismiss, [121], is denied in part, granted in part. Auto Driveaway's claim against Corbett for breach of the personal guaranty, [86] ¶¶ 216–220, is dismissed with prejudice. Tactical Fleet's motion to dismiss for lack of personal jurisdiction, [129], is denied. All defendants shall answer the First Amended Complaint by August 6, 2019, and a status hearing remains set for September 11, 2019, at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: July 23, 2019