**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

AUTO DRIVEAWAY FRANCHISE
SYSTEMS, LLC,

      Plaintiff,

                v.

JEFFREY CORBETT, AUTO DRIVEAWAY
RICHMOND, LLC, INNOVAUTO USA,
LLC, TACTIAL FLEET, LLC and
CHRISTINE WARHURST K/N/A
CHRISTINE CORBETT,

      Defendants.

Case No.:  18-cv-04971

The Honorable Manish S. Shah

## SECOND AMENDED COMPLAINT

Plaintiff Auto Driveaway Franchise Systems, LLC ("**Auto Driveaway**"), by and through its attorneys, states as its Second Amended Complaint against Defendants Jeffrey Corbett ("**Corbett**"), Auto Driveaway Richmond, LLC ("**AD Richmond**"), InnovAuto USA, LLC ("**InnovAuto**") Tactical Fleet, LLC ("**Tactical Fleet**") and Christine Warhurst k/n/a Christine Corbett ("**Warhurst**") as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Auto Driveaway is a franchisor that operates throughout the United States and offers, among other things, private and commercial vehicle transportation, fleet shipping and management, vehicle inspections, and truck transportation.

2.    Until September 29, 2018, Defendant AD Richmond was a multi-unit franchisee of Plaintiff Auto Driveaway, owning and operating three Auto Driveaway franchise locations.

Defendant Corbett is the sole member of Defendant AD Richmond and the Guarantor of the AD Richmond Franchises.

3.     Pursuant to the Franchise Agreements, Auto Driveaway provided Defendants Corbett and AD Richmond with Auto Driveaway's confidential and proprietary information, including, but not limited to Auto Driveaway's technology, software, and systems, to use to operate their Franchises.

4.     Between March and September 2018, while the Franchise Agreements were still in effect, Defendants Corbett and AD Richmond violated the Franchise Agreements and Auto Driveaway's trademark rights by, among other things, secretly engaging Plaintiff Auto Driveaway's software developer to design an unauthorized and revised version of Plaintiff Auto Driveaway's proprietary software and mobile application ("**Unauthorized App**"); failing to disclose and turn over to Auto Driveaway improvements related to the franchise operations; forming new entities, namely Defendants InnovAuto and Tactical Fleet, to compete with Auto Driveaway; creating a brand, and buying a domain name to exploit the Unauthorized App technology for their sole benefit; covertly attempting to sell the unapproved Unauthorized App to Auto Driveaway customers; using the INNOVAUTO mark in connection with Auto Driveaway trademarks; using the Auto Driveaway network to pitch a multi-phase proposal to one or more of Auto Driveaway's largest customers to compete with Auto Driveaway; branding Auto Driveaway's technology and the Unauthorized App under Defendant InnovAuto's mark; failing to have Defendant AD Richmond's management and key employees execute non-disclosure and non-competition agreements; and establishing additional franchise location(s) without the permission of Auto Driveaway.

5.     After Auto Driveaway terminated  the Franchise Agreements on September 29, 2018, Defendants Corbett and/or AD Richmond continued to violate the Franchise Agreements by, among other things, hiring the management team and certain key employees of Defendant AD Richmond to work for Corbett's new company, Tactical Fleet; using confidential Auto Driveaway customer information to meet and solicit Auto Driveaway customers; competing against Auto Driveaway in violation of the restrictive covenants contained in the Franchise Agreements; failing to pay amounts due to Auto Driveaway and its franchisees as required by the Franchise Agreements; failing to submit certain reports to Auto Driveaway as required by the Franchise Agreements; failing to allow Auto Driveaway to perform an accounting of AD Richmond's finances as permitted by the Franchise Agreements; and failing to perform other post-termination obligations as required by the Franchise Agreements.

6.     Defendants' actions have caused, and continue to cause, harm to Plaintiff Auto Driveaway, its franchisees, its reputation in the industry, and the goodwill associated with its trademarks.  Therefore, Plaintiff Auto Driveaway seeks injunctive relief to stop Defendants' unauthorized use of its technology and unfair competition, to protect its trademarks, its system, and its customer relationships, and further seeks an accounting and damages for actions that Defendants have already taken.

**THE PARTIES**

7.     Plaintiff Auto Driveaway is and was at all relevant times a Michigan limited liability company with its principal place of business in Lombard, Illinois.

8.     Auto Driveaway's sole member is Auto Driveaway Systems, LLC, a Delaware limited liability company.

9.     The members of Auto Driveaway Systems, LLC include an Illinois limited

liability company whose individual members are citizens of Illinois; an Illinois corporation with its principal place of business in Illinois; and individuals who are citizens of the states of Illinois, Georgia, California, Wisconsin, Nebraska, and New Jersey.

10.     Defendant Corbett is, and was at all relevant times, a citizen of Virginia.  Corbett is the sole member of Defendant AD Richmond and the guarantor of AD Richmond's franchise obligations.  Corbett is also the sole member of Defendant InnovAuto.  Corbett is the founding member of Defendant Tactical Fleet.

11.     Defendant AD Richmond is and was at all relevant times a Virginia limited liability company with its principal place of business in Richmond, Virginia.

12.     Defendant AD Richmond was a franchisee of Auto Driveaway until September 29, 2018, operating franchise offices in the Richmond, Nashville, and Cleveland territories.

13.     Defendant InnovAuto is, and was at all relevant times, a Virginia limited liability company with its principal place of business in Richmond, Virginia.

14.     Defendant Tactical Fleet is a Virginia limited liability company that was established on or about September 12, 2018.

15.     The original sole member of Tactical Fleet was Corbett.  The current members of Tactical Fleet are Christine Warhurst and Brian Smith, both of whom are citizens of Virginia.

16.     Tactical Fleet is a full service fleet management company that offers complete fleet management and transportation services nationwide.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 15 U.S.C. § 1114, *et. seq.* (the Lanham Act); 28 U.S.C. § 1332 (diversity) and/or 28 U.S.C. § 1367 (supplemental) over the related state law claims.

18.     In the Franchise Agreements, Plaintiff Auto Driveaway and Defendants AD Richmond and Corbett agreed that any state or federal court located in Cook County, Illinois has exclusive jurisdiction regarding any enforcement of, or dispute concerning, the Franchise Agreements.

19.     Venue in this District is proper because Defendants targeted customers in Illinois, Corbett, Smith, and Warhurst came to Illinois on behalf of Defendant InnovAuto and AD Richmond to attend meetings with Auto Driveaway regarding Defendant InnovAuto and AD Richmond, and because the terms of the Franchise Agreements so provide.

20.     The amount of time, money, and effort and the value of the goodwill that Auto Driveaway has expended during the past 65 years and which Defendants have threatened with their actions in this case far exceeds the amount of $75,000.

21.     The amount of money that Defendant Corbett has spent to develop software that he branded with the INNOVAUTO mark and sold in association with the Auto Driveaway Marks to Auto Driveaway customers for the benefit of Defendant InnovAuto is approximately $85,000.

## FACTS

### Auto Driveaway Creates a Market, Expands, and Innovates

22.     Founded in 1952, Plaintiff Auto Driveaway was the first vehicle transport company in the United States and is now the largest in North America.  For more than sixty five years, Auto Driveaway has enjoyed a strong reputation for providing quality professional service in ever expanding areas.   It is constantly adding new services and improving its offerings to meet the evolving needs of its customers.

23.     Today, Auto Driveaway has 40 offices across the United States that provide private and commercial vehicle transportation, fleet shipping, fleet management, truck

transportation, vehicle condition reporting, government vehicle shipping services, vehicle storage, title and registration services, inspections, maintenance, and reconditioning. Auto Driveaway's vehicle transportation services include door-to-door delivery, insurance protection, and an optional expedited service which guarantees vehicle pick-up within 48 hours.

24.     Auto Driveaway's offices are located in the following territories:  Atlanta, GA; Baltimore, MD; Bay Area, CA; Boston, MA; Charlotte, NC; Chicago, IL; Cincinnati, OH; Cleveland, OH; Dallas, TX;  Denver, CO; Detroit, MI; Elkhart, IN; Ft. Lauderdale, FL; Grand Rapids, MI; Houston, TX; Indianapolis, IN; Kansas City, KS; Long Beach, CA; Milwaukee, WI; Minneapolis, MN; Nashville, TN; New Orleans, LA; Oklahoma City, OK; Omaha, NE; Orlando, FL; Philadelphia, PA; Phoenix, AZ;  Pittsburgh, PA; Portland, OR; Richmond, VA; Salt Lake City, UT; San Diego, CA; Seattle, WA; St. Louis, MO; Stockholm, NJ; Syracuse, NY; Tampa, FL; Tucson, AZ; Warwick, RI; Washington DC.  Seventeen of the offices are owned by Auto Driveaway and the remaining twenty-three are owned by various franchisees.

## Auto Driveaway Trade Name, Marks, and System

25.     Plaintiff Auto Driveaway is in the business of franchising its transportation services and it also provides transportation services from company-owned locations across the country under the trade name "Auto Driveaway" (the "**Auto Driveaway Trade Name**").

26.     Plaintiff Auto Driveaway owns numerous trademarks and service marks associated with its franchised and company owned operations.  These include the word mark AUTO DRIVEAWAY, which is registered in the United States Patent and Trademark Office ("**USPTO**") under Registration No. 0946023 for "supplying drivers to drive automobiles from location to location", which has been in continuous use since 1952; AD Design (Reg. No.

3160871) for "vehicle delivery services;" and the pending applications for AUTO

DRIVEAWAY and Design (Ser. No. 87006454) for:

> "Business advisory services in the field of vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Business assistance, advisory and consulting services in the field of vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Business consulting, management, and planning services in the field of vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Business management services, namely, administration of business engaged in vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Business management in the field of vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Business management advisory services relating to franchising; Franchising, namely, consultation and assistance in business management, organization and promotion; Franchising, namely, offering business management assistance in the establishment and/or operation of vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Monitoring services for business purposes to ascertain the geographic locations of movable objects, namely, motor vehicles and individuals; Offering business management assistance in the establishment and/or operation of vehicle delivery and relocation services, truck delivery and relocation services, vehicle storage, vehicle registration and title transfer services, vehicle detailing services; Providing public sector contract vehicle management; Providing tracking services and information concerning tracking of assets in transit, namely, vehicles, trailers, drivers, cargo and delivery containers for business inventory purposes; Services rendered by a franchisor, namely, assistance in the running or management of industrial or commercial enterprises; State vehicular registration and title transfer;

> AUTO DRIVEAWAY and Design (Ser. No. 87006463) for "Automobile cleaning and car washing; Automobile lubrication; Automobile body repair and finishing for others; Automotive maintenance and repair; Automotive oil change services; Mechanic services; Repair or maintenance of two-wheeled motor vehicles; Tire rotating and balancing; Vehicle cleaning; Vehicle detailing; Vehicle washing; Automobile repair and maintenance; Vehicle maintenance and repair" and

> AUTO DRIVEAWAY and Design (Ser. No. 87006470) for "car transport; Freight transportation by truck; Freight and transport brokerage; Freight train transport; Freighting services; Physical relocation services for trucks and trailers belonging to others; Physical storage of motor vehicles; Providing customized driving directions; Providing information concerning collection and delivery of assets in transit, namely, vehicles, trailers, drivers, cargo and delivery containers; Transport by man-powered

vehicles; Truck hauling; Truck transport; Trucking services, namely, hauling of automobiles and trucks; Vehicle-driving services; Hired car transport; Motor vehicle sharing services, namely, providing temporary use of motor vehicles."

27.     Plaintiff Auto Driveaway also owns certain other trademarks and service marks used in association with its businesses which are protected by common law (registered, pending, and common law marks collectively, the "**Auto Driveaway Marks**").  Auto Driveaway has used the Auto Driveaway Marks consistently and pervasively, adding more modern designs through the years (additional Marks are shown in the table below).  True and correct copies of Auto Driveaway's registration certificates are attached to this Verified Complaint at Exhibit A.



28.     Plaintiff Auto Driveaway has built a unique reputation and public recognition for the quality products and services that it provides under the Auto Driveaway Trade Name and Auto Driveaway Marks.  It has developed unique methods and techniques for establishing and

operating Auto Driveaway offices. These methods and operations are offered to Auto Driveaway franchisees pursuant to their franchise agreements and related operations manuals ("**Auto Driveaway System**").

29.     The Auto Driveaway Trade Name, Marks, and System are strongly and highly distinctive, confidential, and proprietary.  Plaintiff Auto Driveaway has expended substantial time, money, and effort to develop the Auto Driveaway System and concept and has acquired substantial goodwill in the industry.

30.     When Auto Driveaway enters into franchise agreements with a franchisee who had not previously owned, or who had not previously worked for, an Auto Driveaway office, the initial term of the franchise agreement was for three (3) years.

31.      When Auto Driveaway enters into franchise agreements with a franchisee who had previously owned, or who had previously worked for, an Auto Driveaway office, the initial term of the franchise agreement was for five (5) years.

32.     The three (3) or five (5) year term of the franchise agreement is reflected on the first page of the franchise agreement.

### Defendant AD Richmond Was An Auto Driveaway Franchisee of the Richmond, Nashville and Cleveland Locations

33.     Defendant Corbett worked for and or owned an Auto Driveaway franchise for over 20 years.  Corbett began working for his stepfather's Auto Driveaway franchise in the 1990s and later bought that business.

34.     In 2011, Defendant Corbett formed his own company, AD Richmond, to purchase his stepfather's Richmond, VA Auto Driveaway franchise.

35.     On or about April 6, 2011, AD Richmond entered into the Richmond Franchise Agreement with Auto Driveaway.   A true and accurate copy of the Franchise Agreement

between Auto Driveaway and AD Richmond for the Richmond franchise is attached as <u>Exhibit B</u> ("Richmond Franchise Agreement"). The Richmond Franchise Agreement was signed by Defendant Corbett as the "Sole Member" of AD Richmond.

36. The Richmond office was a pre-existing office. Because the Richmond office was a pre-existing office, the Initial Term of the Richmond Franchise Agreement was for five (5) years, from April 6, 2011 to April 5, 2016.

37. In 2013, AD Richmond purchased an Auto Driveaway franchise in Nashville, TN and entered into the Nashville Franchise Agreement with Auto Driveaway. A true and accurate copy of the Franchise Agreement between Auto Driveaway and AD Richmond for the Nashville franchise is attached as <u>Exhibit C</u> ("Nashville Franchise Agreement"). The Nashville Franchise Agreement was signed by Corbett as "Owner" of AD Richmond.

38. The Nashville office was a pre-existing office. Because the Nashville office was a pre-existing office, the Initial Term of the Nashville Franchise Agreement was for five years, from February 1, 2013 to January 31, 2018.

39. On or about January 3, 2011, Auto Driveaway entered into a franchise agreement with a franchisee in Cleveland, Ohio.

40. The Cleveland office was a pre-existing office. Because the Cleveland office was a pre-existing office, the initial term of the Cleveland Franchise Agreement was five (5) years, from January 3, 2011 to January 2, 2016.

41. In 2013, Corbett's company, AD Richmond, purchased the Auto Driveaway franchise in Cleveland, OH and assumed the Cleveland Franchise Agreement. A true and accurate copy of the Franchise Agreement for the Cleveland franchise is attached as <u>Exhibit D</u> ("Cleveland Franchise Agreement").

42.     The Richmond, Cleveland, and Nashville Franchise Agreements (collectively the "Franchise Agreements") define AD Richmond as "AD Richmond", "Franchisee" or "you."

43.     The Franchise Agreements define "Franchisee" as:

"**Franchisee**" shall be deemed to include not only the individual or entity defined as "Franchisee" in the introductory section of this Agreement, but **shall also include** all partners of the entity that execute this Agreement (if the entity is a partnership); all shareholders, directors, and officers of the entity that execute this Agreement (if the entity is a corporation); and **all members and managers of the entity that execute this Agreement** (if the entity is a limited liability company).  **By their signatures**, all partners, shareholders, directors, officers, **members**, and managers of the entity that sign this Agreement as Franchisee **acknowledge and accept the duties and obligations imposed upon each of them, individually, by the terms of this Agreement.**

(Exhibits B, C and D, p. 3) (emphasis added.)

44.     In addition, Corbett signed the "BOUND PARTIES Acknowledgment Regarding Controlling Persons and Bound Parties" ("Controlling Person Acknowledgment"), which was attached as Exhibit C to the Richmond and Nashville Franchise Agreements, in which he acknowledged that he owned 100% of AD Richmond.  (Exhibits B and C at Exhibit C).

45.     As Corbett executed or assumed the Franchise Agreements on behalf of Defendant AD Richmond, Corbett was individually bound by the terms of the Franchise Agreements as a "Franchisee" along with AD Richmond.

46.     The Franchise Agreements provide that the parties could enter into renewal terms of five (5) years.

47.     At the expiration of each of the initial five (5) year terms, AD Richmond and Auto Driveaway did not exchange written renewal agreements.

48.     Despite not exchanging written renewal agreements, upon expiration of the Franchise Agreements, Auto Driveaway, AD Richmond, and Corbett extended the terms of the

Franchise Agreements by agreement and continued their franchisor/franchisee relationship pursuant to the terms of the Franchise Agreements on a month-to-month basis.

49.     After the expiration of each of the initial five (5) year terms of the Franchise Agreements, Corbett continued to act and represent himself as an Auto Driveaway franchisee and the parties continued to act in accordance with the rights and obligations under the Franchise Agreements.

50.     For example, in January of 2018, Corbett took multiple steps to form the National Independent Association of Auto Driveaway Owners, Inc. ("Franchisee Association"). Among other things, the purpose of the Franchisee Association was to protect and promote the rights of members in their franchise businesses, safeguard and enhance members' business interests and represent the interests of other franchise owners in discussions with Auto Driveaway. *See* January 19, 2018 Email sent on behalf of Defendant Corbett and AD Richmond to Auto Driveaway Franchisees attached as Exhibit E.

51.     Corbett also acknowledged to Plaintiff Auto Driveaway and represented to third parties that the Franchise Agreements had been continued and were continuing on a month-to-month basis after the expiration of each of the initial five (5) year terms.

52.     In June 2018, during negotiations between Plaintiff Auto Driveaway and Defendants AD Richmond and Corbett with regard to a non-disclosure agreement, Defendants AD Richmond and Corbett wrote with regard to the Franchise Agreements that "…each of which *expired on January 31, 2018 and each of which is being continued on a month-to-month basis* pending the finalization of a mutually acceptable First Renewal Franchise Agreement and Corbett is a Guarantor of each Franchise Agreement…." (*See* Exhibit F.)

53.     In August of 2018, Corbett represented to third parties that he was an Auto Driveaway franchisee operating under a month-to-month franchise agreement.

54.     Further, up through the September 29, 2018 termination of the Franchise Agreements, AD Richmond continued, among other things, to do the following pursuant to the terms of the Franchise Agreements:

(a) present itself as an Auto Driveaway franchisee to Auto Driveaway customers;

(b) make payments to Auto Driveaway of annual franchise fees and monthly royalty fees;

(c) book/move/store Auto Driveaway customer vehicles;

(d) use Auto Driveaway's proprietary software and associated forms and documents;

(e) use Auto Driveaway's United States Department of Transportation ("USDOT") license to transport vehicles across state lines;

(f) use Auto Driveaway's insurance to provide coverage for customer vehicles during transport and made claims under the same insurance policies when customer vehicles were damaged;

(g) coordinate with and use the services of other franchise offices to engage in the business of moving and storing vehicles;

(h) use Auto Driveaway's System's operation and procedures and terms of the Confidential Operations Manual;

(i) use Auto Driveaway's Trademarks, Service Marks, Trade Name and other indicia of being an Auto Driveaway Franchisee;

(j) use Auto Driveaway's email addresses and accounts; and

(k) make payments to other Auto Driveaway franchisees consistent with the Auto Driveaway Franchise Agreements.

55.     On September 29, 2018, Plaintiff Auto Driveaway terminated the Franchise Agreements based upon mutual consent and because Defendants AD Richmond and Corbett were in breach of numerous provisions of the Franchise Agreements.

**Plaintiff's Proprietary Technology: AD Direct, AD360, and AD Driver 360**

56.     Through his position as owner of AD Richmond, Defendant Corbett had access to Auto Driveaway's confidential and proprietary information.

57.     Defendant Corbett was actively involved in the development of new technology and services for Auto Driveaway.  Over the years, Corbett worked closely with Auto Driveaway to expand its offerings.  In one case, Defendant Corbett requested a revised customer module and Auto Driveaway paid a software development company to create one.

58.     For over a decade, Auto Driveaway's primary operational software was a custom designed proprietary program known as AD Direct.  This was the software that all offices used to manage moves and otherwise operate their businesses.

59.     Over the past several years, Auto Driveaway has spent vast sums to upgrade AD Direct to a re-branded and improved program known as AD360.  AD360, which debuted in the summer of 2014, has enhanced features and expansion capabilities.

60.     Sometime later, after Auto Driveaway was using its AD360 software, Defendant Corbett introduced Auto Driveaway to a software development company/hosting service in Virginia called Covintus.  In 2015, Auto Driveaway engaged Covintus in a limited capacity.

61.     In the summer of 2015, Auto Driveaway expanded its engagement with Covintus who assigned a particular developer to create a mobile application for Auto Driveaway's AD360 program.  This mobile application is what became AD Driver 360.

62.     Over the course of that year (2015) and since that time, Covintus has provided hosting services and that same particular developer has provided development services on a regular basis to Auto Driveaway.  Specifically, Covintus has provided updates and fixes to the AD360 program while also developing an AD Driver 360 mobile application.

### Corbett Starts a Competing Venture and Markets His Competing Venture to Auto Driveaway Customers

63.     In Section 8.12 of the Franchise Agreements, Defendants AD Richmond and Corbett agreed with Auto Driveaway as follows:

> **Restrictions on Products and Services**.  You are prohibited from offering or selling any products or services from or through the Franchise that have not been previously authorized by us.  However, if you propose to offer, conduct, or utilize any products, services, material, forms, items, or supplies in connection with or for sale through the Franchise that have not been previously authorized by us, you shall first submit to us a written request for approval.  We may, in our sole discretion, withhold such approval.

(Exhibits B, C and D at ¶ 8.12.)

64.     The Franchise Agreements also required AD Richmond and Corbett to disclose any new technology to the Franchisor.  (Exhibits. B, C, and D at ¶ 12.5.)

65.     In Paragraph 12.5 of the Franchise Agreements, Defendants AD Richmond and Corbett agreed with Auto Driveaway as follows:

> You shall disclose to us prior to executing this Agreement all copyrighted or other pre-existing materials to which you claim ownership or any other rights.  You shall fully and promptly disclose to us all ideas, concepts, methods, and techniques relating to the development and/or operation of the Franchise conceived or developed by you and/or your Affiliates or employees during the term of this Agreement.  All such materials created or conceived by you or in collaboration with others during the term of this Agreement shall be [Auto Driveaway's] sole and exclusive property without further consideration to you.  You agree to execute any documentation necessary to perfect our ownership rights, including, without limitation, copyright, trademark, and patent applications, assignments, and/or recordings as we may request.

(Exhibits. B, C, and D at ¶ 12.5.)

66.     In October 2017, unbeknownst to Plaintiff Auto Driveaway, Defendant Corbett purchased the domain, www.innovauto.com.  (Exhibit G.)

67.     In November 2017, Defendant Corbett asked for an in-person meeting with Rodney Ruth, President and CEO of Auto Driveaway, to discuss various matters.  Mr. Ruth met with Defendant Corbett in AD Richmond's offices on or about November 27, 2017.  During that meeting, Corbett expressed frustration with the Auto Driveaway franchise system and informed Mr. Ruth that he had a plan for a new customer, but would not disclose the details because he had signed a non-disclosure agreement with the customer.

68.     The Franchise Agreements provide that Auto Driveaway is a third-party beneficiary to any non-disclosure agreements entered into by the franchisee. (Exhibits. B, C, and D at ¶12.6 and Exhibit F.)

69.     There was no legitimate reason for Defendant Corbett to have withheld business information from Auto Driveaway.

70.     On or about December 8, 2017, Mr. Ruth spoke on the telephone with Defendant Corbett.  Corbett said that he was pitching Amazon for truck services through AD Richmond and that the projects were starting in January 2018.

71.     During that December 8, 2017 telephone call, Mr. Ruth offered to provide any support necessary to AD Richmond and Corbett, including purchasing vehicles and trailers for multiple locations.

72.     Later that month, on or about December 27, 2017, unbeknownst to Plaintiff Auto Driveaway, Defendant Corbett formed a new limited liability company in Virginia, Defendant InnovAuto.

73.     On or about March 15, 2018, Defendants Corbett, AD Richmond, and or those acting in concert with them, hired Covintus, Auto Driveaway's software development company, and the very same individual developer who was working on Auto Driveaway's AD Driver 360 mobile application to develop the Unauthorized App.  *See* Statement of Work ("SOW") attached as <u>Exhibit H.</u>

74.     The Unauthorized App was being designed by Defendants AD Richmond and Corbett to allow for the inspection of vehicles via a mobile device in the field and produce condition reports.  This is the same concept that Auto Driveaway hired the developer to create as AD Driver 360, which connects to the existing AD360 technology.

75.     On and before April 12, 2018, Defendants Corbett, AD Richmond and or those acting in concert with them continued developing the Unauthorized App.   The development summary was already on "Version 1.1.4 4/12/2018" and included the following features: "Login Roles & Permissions; Field Reporting Requirements; Photo Handler; Assessment Reports and Services;" (<u>Exhibit I.</u>)

76.     Crucially, the "Statement of Purpose" includes the following language: "Utilize the ***AD Richmond – [Auto Driveaway Customer]*** Infrastructure to capture the bridging requirements."  *(emphasis added)*.   It also states that "[e]xpectations are for the system to perform within a pre-existing environment while acting as a bridging technology between fleet management companies through licensing." (<u>Exhibit I.</u>)

77.     Plaintiff Auto Driveaway has been conducting vehicle inspections and generating condition reports for years. Plaintiff Auto Driveaway began developing its AD Driver 360 mobile application in 2015.  A crucial feature of the AD Driver 360 mobile application is to

enhance the ability for drivers to conduct vehicle inspections and generate condition reports in the field. (Exhibit J.)

78.     AD Driver 360 and the Unauthorized App have very similar features and functionality; both begin with log in roles and permissions; both contain a photo handler/capability; both have the ability for clients to create contracts in the application; both provide for a vehicle inspection/condition report; both collect general vehicle information; both contain a checklist for creating a damage report; both use a mobile device's camera to record damage; and both input this information into a damage report.

79.     Defendants Corbett and AD Richmond were involved in designing and planning the AD Driver 360 mobile application for Auto Driveaway.  Their employees tested the AD Driver 360 mobile application during development and gave feedback to Auto Driveaway for the developer.

### Corbett's and AD Richmond's Unauthorized Use of the
### Licensed Marks and Auto Driveaway System to Compete with Auto Driveaway

80.     At some point, Defendants created an "Auto Driveaway Service Overview" sales brochure.  This sales brochure features Auto Driveaway's Marks and a description of Auto Driveaway's history and service offerings.  There is a section titled "Coming Soon" that states: "Soon to be releasing our proprietary InnovAuto software that scans the units and releases real-time valuations, considering cosmetic/mechanical damage, local vehicle market pricing, and repair costs."  (Exhibit K.)

81.     Defendants failed to submit this sales brochure to Auto Driveaway for approval as required by the Franchise Agreements.

82.     In addition, Plaintiff Auto Driveaway never granted Defendants permission to use the mark INNOVAUTO in association with the Auto Driveaway Marks.

83.     On or about June 28, 2018, Defendants or those in concert with them posted a video commercial on YouTube.  As of July 18, 2018, that video was available online at: https://www.youtube.com/watch?v=sgPYkql7nTg and titled: InnovAuto5.  Screenshots of the YouTube video are attached hereto as (Exhibit L.)

84.     In the YouTube video, Defendants falsely and improperly represented to the public that Auto Driveaway and Defendant InnovAuto are related.  (Exhibit L.)

85.     The YouTube Video opens with a large AUTO DRIVEAWAY trademark and falsely offers services and products as being from Auto Driveaway and Defendant InnovAuto.

86.     Plaintiff Auto Driveaway's logo contains a "pin drop" feature as can be seen on its website, https://autodriveaway.com/, and below:



The unauthorized YouTube video created and uploaded by Defendants also used these "pin drops" throughout the video.  (Exhibit L.)

87.     The YouTube Video specifically targets customers at locations where Auto Driveaway has offices, including Illinois.

88.     The YouTube Video contains a screen showing a condition report with the Vehicle Identification Numbers of at least two actual vehicles that were moved by Auto Driveaway.  (Exhibit L.)

89.     The YouTube Video shows the marks INNOVAUTO and INNOVAUTO and Design in association with Plaintiff Auto Driveaway and Auto Driveaway's Marks and references "our INNOVAUTO site."

90.     Plaintiff Auto Driveaway has not authorized the affiliation of Auto Driveaway with any website associated with Defendant InnovAuto or any website that uses the mark INNOVAUTO.  (Exhibit L.)

91.     In the Franchise Agreements, Defendants Corbett and AD Richmond acknowledged that Auto Driveaway developed a system for establishing, operating, and promoting "for hire" motor carrier offices specializing in secondary movement of automobiles, vans, trucks, and other vehicles for individuals and corporations, which includes the use and license of certain valuable service marks such as AUTO DRIVEAWAY, AD Design, and AUTO DRIVEAWAY and Design.  (Exhibits B, C, and D at p. 1.)

92.     In the Franchise Agreements, Plaintiff Auto Driveaway granted, and Defendant AD Richmond accepted, the "non-exclusive right to operate a "for hire" motor carrier office utilizing the Auto Driveaway System and the Licensed Marks at the Franchised Office within the Franchise Territory."  (Exhibits B, C, and D at ¶ 2.1.)

93.     In the Franchise Agreements, Defendants AD Richmond and Corbett expressly acknowledged Auto Driveaway's rights in and to the Licensed Marks attached to the Franchise Agreements as Exhibit B and agreed "not to represent in any manner that [Defendants AD Richmond and Corbett] have acquired any ownership rights in the Licensed Marks."  (Exhibits B, C, and D at ¶ 6.1.)  Defendants AD Richmond and Corbett further agreed that any and all goodwill associated with the Auto Driveaway System and identified by the Licensed Marks is Auto Driveaway's property and shall inure directly and exclusively to Auto Driveaway's benefit. (Exhibits B, C, and D at ¶ 6.1.)

94.     Defendants AD Richmond and Corbett agreed that they would display and use only the Licensed Marks and Auto Driveaway System as required in the Franchise Agreement,

that they would not use the Licensed Marks without Auto Driveaway's prior written consent, and that during the term of the Franchise Agreements and thereafter, they would not, directly or indirectly, infringe upon Auto Driveaway's rights with respect to the Licensed Marks. "You agree not to use any other marks except with our prior written consent." (Exhibits B, C, and D at ¶ 6.2.)

95. Despite these promises, Defendants Corbett and AD Richmond associated the INNOVAUTO mark with Auto Driveaway's Marks and their Franchises without Auto Driveaway's consent to promote the competing Defendant InnovAuto's business.

96. Defendants Corbett and AD Richmond misused the Auto Driveaway Marks by associating them with an unauthorized mark.

### Corbett's and AD Richmond's Competition with Auto Driveaway During the Terms of the Franchise Agreements

97. In Section 12.2 of the Franchise Agreements, AD Richmond agreed as follows:

**In-Term Non-Competition**.  During the term of this Agreement, you and the Bound Parties agree that except for the Franchise, you shall not:

(a) have any direct or indirect interest as a disclosed or beneficial owner in any Competitive Business; provided, however, that you shall not be prohibited from owning equity securities of any business whose shares are traded on a stock exchange or on the over-the-counter market so long  as the ownership interest shall represent tow percent (2%) or less of the total number of outstanding shares;

(b) perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business anywhere;

(c) divert or attempt to divert any business related to the Franchise or the Auto Driveaway System directly or indirectly to a Competitive Business;

(d) divert or attempt to divert employment of any or our employees or those of our Affiliates or of another Auto Driveaway franchisee to any Competitive Business; or

(e) directly or indirectly solicit or employ any of our employees or those of our Affiliates or of another Auto Driveaway franchisee without first obtaining the

employer's prior written consent.

(<u>Exhibits B, C and D at ¶ 12.2.</u>)

98.     The Franchise Agreements define "Franchised Territory" to be "the specific territory set forth in <u>Exhibit A</u>.  The Franchised Territory consists of the area within a designated radius around the Franchised Office.  The Franchised Territory may (but is not required to be) defined by reference to all or any portion of a CBSA (depending on factors such as population and population density of a CBSA), as mutually determined by the Franchisor and Franchisee."

(<u>Exhibits B, C, and D at p. 2.</u>)

99.     AD Richmond's Franchise Territories, as described in the Franchise Agreements, are: (1) Richmond, Virginia and several Core Based Statistical Areas ("CBSA") in Virginia; (2) Nashville, Tennessee and several CBSAs in Tennessee; and (3) Cleveland, Ohio and 5 counties in Ohio.  (Exhibit A to each of the Franchise Agreements attached hereto as <u>Exhibits A, B, and C.</u>)

100.     The Franchise Agreements define "Competitive Business" as "<u>operating</u> "for-hire" motor carrier businesses operating as either a common carrier or a contract carrier or <u>any business</u> which operates or grants franchises or licenses to others to operate a business <u>that provides similar services and/or products as those offered by us</u>.  Competitive Business shall not include another Auto Driveaway Office operated by you."  (<u>Exhibits B, C, and D at p. 2.</u>) (emphasis added.)

101.     Prior to September 29, 2018, Defendants AD Richmond and Corbett used their autodriveaway.com e-mail addresses to actively pursue a competing business on behalf of Corbett and Defendant InnovAuto.  (<u>Exhibit M.</u>)

102.     In July 2018, Defendants Corbett and AD Richmond ordered business cards from Auto Driveaway for a new employee.  Thereafter, this same employee was also issued an email address by Defendant AD Richmond at Defendant InnovAuto's domain.

103.     Defendant Corbett scheduled a meeting for July 10, 2018 with one of Auto Driveaway's largest customers at which he planned to pitch a multi-phase proposal for his new company with a Phase 1 value in excess of $500,000.  That proposal was branded with Auto Driveaway Marks and prominently serves up the INNOVAUTO and Design mark as providing "Solutions" to the customer's "Challenges."  Among the "solutions" proposed to be provided by Defendant InnovAuto are services currently offered by Auto Driveaway.  (Exhibit N.)

104.     Defendant Corbett failed to notify Auto Driveaway about this meeting or that he intended to co-brand Auto Driveaway services with Defendant InnovAuto.

105.     On or about July of 2018, Defendants AD Richmond and Corbett signed a lease for two buildings in Manteca, California, with the stated use being "general offices, warehouse/shop and yard *__for an automobile shipping company__*, which shall include storage of new/used (no in-operable vehicles)" (emphasis added).  A true and correct copy of the lease signed by Mr. Corbett on behalf of Defendant AD Richmond is attached as Exhibit O.

106.     Defendants AD Richmond and Corbett did not have authority to open an Auto Driveaway location in California, and the two leased buildings are within 50 miles of an already existing Auto Driveaway location.

107.     Defendants AD Richmond and Corbett actively attempted to lease more locations to operate their competing businesses and to compete with Auto Driveaway.  In correspondence with a realtor, Defendant Corbett states, "… we are looking at leasing double digit locations across the US…."  (Exhibit P.)

**Corbett's and AD Richmond's Failure to Disclose Its Unauthorized App and Use
of Auto Driveaway's Confidential Information for Their Own Benefit**

108.    On July 11, 2018, Auto Driveaway launched the latest version of its AD Driver 360 mobile application. (Exhibit Q.)

109.    The AD Driver 360 mobile application contains many of the same features that are described in the statements of work ("SOWs") for the Unauthorized App.

110.    The Unauthorized App and related technology were developed during the term of the Franchise Agreements.

111.    A plain reading of the Franchise Agreements requires Defendants to "fully and promptly disclose to [Auto Driveaway] all ideas, concepts, methods, and techniques relating to the development and/or operation of the Franchise conceived or developed by you and/or your Affiliates or employees during the term of this Agreement."  (Exhibits B, C and D at §12.5.)

112.    Defendants did not, and have refused to, disclose any information about the Unauthorized App to Auto Driveaway.

113.    The Franchise Agreements also address ownership of Improvements.  "All such materials created or conceived by you or in collaboration with others during the term of this Agreement shall be our sole and exclusive property without further consideration to you." (Exhibits B, C and D at §12.5.)

114.    Despite these terms, Defendant Corbett claims that he owns the Unauthorized App and related technology.

115.    Under the Franchise Agreements, the Unauthorized App is the property of Auto Driveaway.

116.    Further, under the Franchise Agreements, Defendants Corbett and AD Richmond agreed not to disclose any Confidential Information provided to them during the course of the

24

franchise relationship. They further agreed that they "shall not use the Confidential Information in any other business capacity; …." They also agreed that they "… shall not contest [Auto Driveaway's] right to exclusively use the Confidential Information." (Exhibits B, C, and D at ¶ 12.1.)

117. The term "Confidential Information" includes among other things, "… ideas, proprietary software, research and development, know-how, business and marketing plans and proposals.…" (Exhibits B, C, and D at ¶ 1.)

118. Defendants Corbett and AD Richmond used the "Confidential Information" that they learned through their position as franchisee owner and franchisee, respectively, in developing the Unauthorized App.

### Corbett's and AD Richmond's Failure to Sign Bound Parties to the Non-Disclosure and Non-Competition Agreements.

119. Defendants Corbett and AD Richmond breached their obligations to protect Auto Driveaway's confidential and proprietary information by failing to require their key employees to execute non-disclosure and non-competition agreements.

120. Under Section 12.6 of the Franchise Agreements, Auto Driveaway and Corbett and AD Richmond agreed as follows:

> **Third Party Non-Disclosure**. You shall execute non-disclosure and no-competition agreements (in the form of Exhibit G attached hereto) with the Bound Parties that contain the restrictions of this Section. We shall be a third party beneficiary of such agreements and you shall not amend, modify, or terminate any such agreement without our prior written consent. You shall provide us with the contact information for each of these people and shall update such information as necessary.

Exhibits B, C and D at 12.6.)

121.    "Bound Parties" is defined in the Franchise Agreements to be "Affiliates, officers, directors, shareholders, managers, members, partners, employees, agents, spouse, immediate family members, and representatives."  (Exhibits B, C and D at ¶ 12.1.)

122.    Defendants Corbett and AD Richmond did not require any Bound Parties, including officers and employees, to execute non-disclosure and non-competition agreements in the form of Exhibit G.

**Defendants' Competition After The Termination of the Franchise Agreements**

123.    The Franchise Agreements confer certain post-termination obligations on AD Richmond and Corbett.

124.    Upon termination, the Franchise Agreements required, among other things, Defendants AD Richmond and Corbett to immediately submit all Required Reports to Auto Driveaway; pay all amounts owed to Auto Driveaway; and upon request, allow for an audit of its records.  (Exhibits B, C and D at ¶ 15.)

125.    Although the Franchise Agreements have been terminated, Defendants AD Richmond and Corbett have not submitted any Required Reports, paid amounts owed to Auto Driveaway, paid all amounts due other franchisees, or complied with other post-termination obligations.

126.    In addition, upon the termination, assignment, or transfer of the Franchise Agreements for any reason, Defendants AD Richmond and Corbett agreed that they would not engage in a Competitive Business:

> **Post-Term Non-Competition**.  Upon termination, assignment, or transfer of this Agreement for any reason (other than an approved transfer to an Affiliate of yours) you and the Bound Parties covenant that for a period of two (2) years after such termination, assignment, or transfer that you shall not engage, directly or indirectly, as an owner, operator, or in any managerial capacity, in any Competitive Business, at or within a fifty (50) mile radius of the former

Franchised Territory or any other Territory with an Auto Driveaway Office other than as an authorized franchise owner of another Auto Driveaway Office. You agree that the purpose of this covenant is not to deprive you of your livelihood and will not do so, but is rather to protect the goodwill and interest of the Auto Driveaway System. You agree that if you are engaged as an owner, operator, consultant, or in any managerial capacity in any Competitive Business, you assume the burden of proving that you have not used our confidential information, trade secrets, methods of operation, or any proprietary components of the Auto Driveaway System. This protection shall be in addition to and not in lieu of all other protections for such trade secrets and confidential information available in law or in equity.

(Exhibits B, C, and D at ¶ 12.2.)

127. Defendants AD Richmond and Corbett acknowledged that the purpose of the covenant in paragraph 12.3 of the Franchise Agreements was not to deprive them of their livelihood and that enforcing the covenant would not deprive them of their livelihood. (Exhibits B, C, and D at ¶ 12.3.)

128. Defendants AD Richmond and Corbett acknowledged that the purpose of the covenant in paragraph 12.3 of the Franchise Agreements was to protect the goodwill and interest of the Auto Driveaway System. (Id.)

129. The obligations under Section 12 of the Franchise Agreements survive the termination or expiration of the Franchise Agreements.

130. In August of 2018, Corbett, along with two other AD Richmond officers (Christine Warhurst and Brian Smith) met with Tint World to inquire about becoming a Tint World Franchisee.

131. At that time, Christine Warhurst was the Chief Human Resources Officer of AD Richmond and Brian Smith with the Chief Operating Officer of AD Richmond.

132. Corbett was interested in becoming a Tint World franchisee so that he could perform after market and reconditioning services for the retail and fleet management industries.

The Tint World franchise locations that Corbett was interested in were the key customer locations of Element Fleet Management ("Element") and Lease Plan, both of which are Auto Driveaway customers, and Element's customer Amazon.

133. On or about September 6, 2018, Corbett, along with David Pelletier and Brian Smith, executed a franchise agreement with Tint World for four locations – 2 in Virginia, 1 in Tennessee, and 1 in California.

134. On or about September 12, 2018, Defendant Corbett, through his registered agent Thomas O'Brien, incorporated Tactical Fleet, which the Virginia Secretary of State's online registry reveals is located at the same address as AD Richmond's offices. *See* Exhibit R.

135. Tactical Fleet was formed by Corbett to avoid the post termination non-competition restrictions in the Franchise Agreements and to compete against Auto Driveaway and its franchisees.

136. On or about September 21, 2018, Defendant Corbett and/or his agent completed and submitted a Safety and Fitness Electronic Records ("SAFER") System document, which reveals that Tactical Fleet One LLC d/b/a TAC Fleet Services (a second company of Corbett's) applied to engage in a business referred to as "Auth. For Hire," and described cargo carried as: a) "General Freight," b) "Motor Vehicles," and c) "Drive/Tow Away." Exhibit S. The same document reveals that TAC Fleet Services may have been assigned a USDOT license number, specifically license # 3190888. Id.

137. The USDOT application description is the same as/identical to that of Auto Driveaway.

138. In or before September 2018, Corbett became engaged to Christine Warhurst, the Chief of Human Resources for Defendant AD Richmond.

139.    On or about September 27, 2018, Corbett terminated the employees of AD Richmond.

140.    At or around the time that Corbett terminated the employees of AD Richmond, Corbett told at least one employee of AD Richmond that even though Auto Driveaway was terminating the franchise agreements, he would branch out on his own, things would be business as usual, nothing would change, he would utilize Tint World and other locations and he would start putting everything in someone else's name.

141.    Tactical Fleet is a Competing Business as defined by the Franchise Agreements. The Tactical Fleet website – www.tacfleetservices.com – describes Tactical Fleet's business as follows:

> *Tactical Fleet is a full-service fleet management company dedicated to serving our clients through complete fleet management and transportation services.  With our innovative fleet assessment application tool, the QuarterMaster, TacFleet provides industry leading fleet data collection and customized reporting options for our clients and leasing companies.  We offer clear and proactive solutions for all of your fleet management needs at very competitive prices.*

(Exhibit T).

142.    On or about September 27, 2018, Defendant Corbett and Tactical Fleet hired the management team and key employees of AD Richmond as the management team of Tactical Fleet.  Specifically, the following AD Richmond employees now hold the same or similar positions at Tactical Fleet:

| Employee Name | AD Richmond Position | Tactical Fleet Position |
|---|---|---|
| Jeffrey Corbett | President, Sole Shareholder | Former Shareholder |
| Christine Warhurst | Chief Human Resources Officer | Chief Executive Officer & Majority Shareholder |
| Brian Smith | Chief Operating Officer | Chief Operating Officer & Minority Shareholder |
| Yvonne Jordaans | Controller/Finance Director | Director of Finance & Controller |

| Neil Varone | Director of IT and Product Development | Chief Information Officer |
|---|---|---|
| Jennifer Lee | Director of Customer Experience | Director of Marketing & Data Services |
| Bill Snead | Virginia Network and Logistics Manager | Regional Network Coordinator |
| Peter Lewis | Director of Strategic Relations (Lease Plan) | Strategic & Business Development Manager |
| Shannan Jordaans | Part Time Finance Support Specialist | Customer Relations & Accounting Specialists |
| Leoni Wells | Courtesy Delivery Specialist | Transportation Manager |
| Grayson Mullins | IT Project Manager | IT Specialist |
| Chris O'Donnell | Special Project Manager | Logistics Coordinator |
| Kevin Salsedo | Account Manager | Regional Network Coordinator |
| Brad Notaro | Sr. Director of Strategic Relations (Element) | Senior Director of Strategic & Business Development |

143.    Tactical Fleet has also hired two former car carrier truck drivers of Auto Driveaway to drive for Tactical Fleet.

144.    Tactical Fleet is already meeting with Auto Driveaway customers and moving vehicles in competition with Auto Driveaway.

145.    Tactical Fleet is operating out of an office at 9100 Arboretum Parkway, Suite 300, Richmond, Virginia, which is within fifty (50) miles of the former AD Richmond office.

146.    After September 29, 2018, the date on which Defendant AD Richmond's month-to-month Franchise Agreements were terminated, Defendant Corbett met with representatives of Element Fleet Management, one of Auto Driveaway's largest customers.

147.    As of October 9, 2018, the telephone number of AD Richmond was still operational.

148.    Tactical Fleet is advertising that it has a vehicle assessment tool, similar to ADFS' AD Driver 360, called the QuarterMaster assessment tool.

149.    Tactical Fleet claims that the QuarterMaster "*provides detailed assessment reports and pictures of each vehicle within your fleet. This includes: mechanical and engine related information, overall body and interior condition, as well as current market value of each respective vehicle.*" Tactical Fleet further claims that "*[t]hrough detailed and customized reporting, you are better able to manage and track your asset's usage to assist in determining the actual need for the vehicle and organizational impact. This information can then be used to make recommendations to assist management with planning for future fleet transition needs.*" (Exhibit U).

150.    On or about October 26, 2018, Corbett claimed to have sold his ownership interest in Tactical Fleet. Corbett sold his ownership interests to either his fiancée, Christine Warhurst, the former Chief Human Resources Officer of AD Richmond and/or to the former Chief Operating Officer of AD Richmond, Brian Smith.

151.    However, despite such transfer, Corbett is still involved in the day to day operations of Tactical Fleet.

152.    Defendant Tactical Fleet is the alter ego of AD Richmond. Tactical Fleet was established for the substantially identical business purpose as AD Richmond; seeks the same types of customers as AD Richmond; employs the same management team as AD Richmond; provides the same services as AD Richmond; and addresses the same market.

153.    Defendants AD Richmond and Corbett agreed that Auto Driveaway is entitled to seek injunctive relief against any actual or contemplated breach of the restrictive covenants in the Franchise Agreements without posting a bond. (Exhibits B, C, and D at ¶ 12.4.) Defendants AD Richmond and Corbett further agreed that they would be liable for Auto Driveaway's costs and attorneys' fees incurred to enforce Section 12 of the Franchise Agreements.

**Corbett as Personal Guarantor**

154.     Defendant Corbett personally and unconditionally guaranteed to Auto Driveaway that he would "punctually pay and perform each and every undertaking, agreement and covenant set forth in the Franchise Agreements," and he agreed to be personally bound by, and personally liable for the breach of each and every provision in the Franchise Agreement.  (Exhibit H attached to the Franchise Agreements, which are attached hereto as Exhibits B, C and D.)

155.     Defendant Corbett is responsible for the violations of the Franchise Agreements by AD Richmond.

**COUNT I**

**Trademark Infringement**
**Lanham Act § 32**
**(Against Corbett, AD Richmond and InnovAuto)**

156.     Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

157.     Plaintiff Auto Driveaway owns the Marks described above in Paragraphs 25-27 and the substantial goodwill associated therewith.

158.     Plaintiff Auto Driveaway's trademark registrations set forth in Exhibit A are prima facie evidence of their validity and provide constructive notice to others of Auto Driveaway's claim of ownership.   15 U.S.C. § 1115, *et seq*.   Further, in the Franchise Agreements, Defendants had actual knowledge of Auto Driveaway's claims of ownership.

159.     Under the Franchise Agreements, Defendant AD Richmond is a mere licensee with a right to use the Auto Driveaway's Marks and the associated goodwill, but only to the extent permitted by the Franchise Agreements.   Defendant Corbett is a Guarantor of the Franchise Agreements.

160.    Defendant AD Richmond's violations of the Franchise Agreement and failure to properly operate the business in compliance with the Auto Driveaway System, constitutes a misappropriation of Auto Driveaway's Marks and Trade Name.   Likewise, Defendant Corbett is a Guarantor of the Franchise Agreements.

161.    Defendants Corbett and AD Richmond have used and may be continuing to use the Auto Driveaway Marks in an unauthorized manner to promote Defendant InnovAuto.

162.    Defendant InnovAuto has no rights to use the Auto Driveaway Marks in any manner.

163.    Defendant InnovAuto has used and may be continuing to use the Auto Driveaway Marks in a manner to create a false association between the companies as to the source of products and services.

164.    Defendants' improper use of the Auto Driveaway Marks has caused and may continue to cause immediate and irreparable harm to Auto Driveaway due to its loss of control over the quality of goods and services advertised, offered, and provided under its Marks.   The loss of Auto Driveaway's right to control the use of the Marks and the reputation of the services and goods provided in connection therewith is real and substantial.

165.    Defendants' use of the Auto Driveaway Marks in association with Defendant InnovAuto's marks INNOVAUTO and INNOVAUTO and Design of Vehicle deceived and caused confusion, and the continued use of the same is likely to continue to cause confusion as to the source of the products and services offered by Defendants.

166.    Defendants' unauthorized use and any continued use of Auto Driveaway's Marks has benefitted Defendants as they have profited from their improper use.

167. Plaintiff Auto Driveaway has incurred damages, and may continue to suffer damages, from Defendants' unauthorized use of the Auto Driveaway Marks.

168. Defendants have knowingly and willfully infringed and may be continuing to infringe upon Auto Driveaway's Trade Name and Marks.

169. Defendants' improper use of the Auto Driveaway Marks constituted and may continue to constitute trademark and service mark infringement under the Lanham Act, 15 U.S.C. § 1114(1). Defendants' infringing conduct was and may continue to be willful infringement under 15 U.S.C. § 1114(1) and therefore constitutes an exceptional case under 15 U.S.C. § 1117(a).

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, InnovAuto, and AD Richmond as follows:

a) An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Trade Name and Marks;

b) Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c) A joint and several award of compensatory damages, treble damages, Defendants' profits, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

d) All such other relief the Court deems just and appropriate.


## COUNT II

### Trademark Infringement
### Common Law
### (Corbett, AD Richmond and InnovAuto)

170. Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

171. Plaintiff Auto Driveaway owns the Marks described above in Paragraph 25-27 and the substantial goodwill associated therewith.

172.     Under the Franchise Agreements, Defendant AD Richmond is a mere licensee with a right to use the Auto Driveaway's Marks and the associated goodwill, but only to the extent permitted by the Franchise Agreements.   Defendant Corbett is a Guarantor of the Franchise Agreements.

173.     Defendant AD Richmond's violations of the Franchise Agreement and failure to properly operate the business in compliance with the Auto Driveaway System, constitutes a misappropriation of Auto Driveaway's Marks and Trade Name.   Defendant Corbett is a Guarantor of the Franchise Agreements.

174.     Defendants Corbett, AD Richmond and InnovAuto have used and may be continuing to use the Auto Driveaway Trade Name and Marks in an unauthorized manner to promote Defendant InnovAuto.

175.     Defendant InnovAuto has no rights to use the Auto Driveaway Trade Name and Marks in any manner.

176.     Defendants' use of the Auto Driveaway Trade Name and Marks in association with Defendant InnovAuto's marks INNOVAUTO and INNOVAUTO and Design of Vehicle deceives and causes confusion, and is likely to continue to cause confusion as to the source of the products and services offered by Defendants.

177.     Defendant InnovAuto has used and may be continuing to use the Auto Driveaway Marks in a manner to create a false association between the companies as to the source of products and services.

178.     Defendants' improper use of the Auto Driveaway Marks caused and may continue to cause immediate and irreparable harm to Auto Driveaway due to its loss of control over the quality of goods and services advertised, offered, and provided under its Marks.   The loss of

Auto Driveaway's right to control the use of the Marks and the reputation of the services and goods provided in connection therewith is real and substantial.

179.    Defendants knowingly and willfully infringed upon Auto Driveaway's Trade Name and Marks, and may be continuing to do so.

180.    Defendants' improper use of the Auto Driveaway Marks constitutes trademark and service mark infringement under common law.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, InnovAuto, and AD Richmond as follows:

a)  An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Trade Name and Marks;

b)  Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c)  A joint and several award of compensatory damages, punitive damages, Defendants' profits, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

d)  All such other relief the Court deems just and appropriate.

## COUNT III

### False And Deceptive Advertising
### Lanham Act § 43 (a)(1)(b)
### (Corbett, AD Richmond and InnovAuto)

181.    Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

182.    Auto Driveaway owns the Marks described above in Paragraph 25-27 and the substantial goodwill associated therewith.

183.    Under the Franchise Agreements, Defendant AD Richmond is a mere licensee with a right to use the Auto Driveaway's Marks and the associated goodwill, but only to the extent permitted by the Franchise Agreements.

36

184.    Defendant AD Richmond's violations of the Franchise Agreement and failure to properly operate the business in compliance with the Auto Driveaway System constitutes a misappropriation of Auto Driveaway's Marks and Trade Name.

185.    Defendants Corbett and AD Richmond have used and may be continuing to use the Auto Driveaway Marks in an unauthorized manner to promote Defendant InnovAuto.

186.    Defendant InnovAuto has no rights to use the Auto Driveaway Marks in any manner.

187.    Defendants' use of the Auto Driveaway Marks in association with Defendant InnovAuto's marks INNOVAUTO and INNOVAUTO and Design of Vehicle does deceive and cause confusion, and is likely to continue to cause confusion, as to the source of the products and services offered by Defendants.

188.    Defendants have made and may be continuing to make a false statement of fact about Defendant InnovAuto's business and products by associating them with Auto Driveaway's Marks.

189.    Defendants' deception is material and likely will influence consumer decisions when purchasing InnovAuto's and Auto Driveaway's business or products.

190.    Defendants have caused their false statements to be placed into interstate commerce and may be continuing to do so.  Indeed, Defendants have posted a YouTube video holding out to the public that Defendant InnovAuto and Auto Driveaway are affiliated. Defendants are attempting to capitalize on the years of goodwill Auto Driveaway has created in its Marks.

191.    Defendants' improper use of the Auto Driveaway Marks has caused and may continue to cause immediate and irreparable harm to Auto Driveaway due to its loss of control

over the quality of goods and services advertised, offered, and provided under its Marks. The loss of Auto Driveaway's right to control the use of the Marks and the reputation of the services and goods provided in connection therewith is real and substantial.

192.     Defendants have knowingly and willfully infringed and may be continuing to knowingly and willfully infringe upon Auto Driveaway's Trade Name and Marks.

193.     Defendants intend to profit by using the Auto Driveaway name and marks to divert customers from Auto Driveaway to Defendants' new company, InnovAuto, so that the customers purchase services from Defendants and not Auto Driveaway.

194.     Defendants' use of the Auto Driveaway Marks violates the Lanham Act, 15 U.S.C. § 1125.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, InnovAuto, and AD Richmond as follows:

a)   An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Trade Name and Marks and further engaging in false and deceptive advertising;

b)   Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c)   A joint and several award of compensatory damages, treble damages, Defendants' profits, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

d)   All such other relief the Court deems just and appropriate.

## COUNT IV

### False Designation of Origin
### Lanham Act § 43 (a)(1)(a)
### (Corbett, AD Richmond and InnovAuto)

195.     Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

196.     Plaintiff Auto Driveaway owns the Marks described above in Paragraph 25-27 and the substantial goodwill associated therewith.

197.     Under the Franchise Agreements, Defendant AD Richmond is a mere licensee with a right to use the Auto Driveaway's Marks and the associated goodwill, but only to the extent permitted by the Franchise Agreements.

198.     Defendant AD Richmond's violations of the Franchise Agreement and failure to properly operate the business in compliance with the Auto Driveaway System, constitutes a misappropriation of Auto Driveaway's Marks and Trade Name.

199.     Defendants Corbett and AD Richmond have used and may continuing to use the Auto Driveaway Trade Name and Marks in an unauthorized manner to promote Defendant InnovAuto.

200.     Defendant InnovAuto has no rights to use the Auto Driveaway Marks in any manner.

201.     Defendants' use of the Auto Driveaway Marks in association with Defendant InnovAuto's marks INNOVAUTO and INNOVAUTO and Design of Vehicle does deceive and cause confusion, and is likely to continue to cause confusion, as to the source of the products and services offered by Defendants.

202.     Defendants have made and may be continuing to make a false statement of fact about Defendant InnovAuto's business and products by associating them with Auto Driveaway's Marks.

203.     Defendants' deception is material and likely will influence consumer decisions when purchasing InnovAuto's and Auto Driveaway's business or products.

204. Defendants have caused their false statements to be placed into interstate commerce and may be continuing to do so. Indeed, Defendants have posted a YouTube video holding out to the public that Defendant InnovAuto and Auto Driveaway are affiliated. Defendants are attempting to capitalize on the years of goodwill Auto Driveaway has created in its Marks.

205. Defendants' improper use of the Auto Driveaway Marks has caused and may continue to cause immediate and irreparable harm to Auto Driveaway due to its loss of control over the quality of goods and services advertised, offered, and provided under its Marks. The loss of Auto Driveaway's right to control the use of the Marks and the reputation of the services and goods provided in connection therewith is real and substantial.

206. Defendants have knowingly and willfully infringed and may be continuing to knowingly and willfully infringe upon Auto Driveaway's name and Marks.

207. Defendants intend to profit by using the Auto Driveaway name and marks to divert customers from Auto Driveaway to Defendants' new company, InnovAuto, so that the customers purchase services from Defendants and not Auto Driveaway.

208. Defendants' use of the Auto Driveaway Marks violates the Lanham Act, 15 U.S.C. § 1125.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, InnovAuto, and AD Richmond as follows:

a) An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Trade Name and Marks or engaging in acts of false designation;

b) Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c) A joint and several award of compensatory damages, treble damages, Defendants' profits, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

d)  All such other relief the Court deems just and appropriate.

**COUNT V**
**Breach of Contract – Franchise Agreements**
**(Corbett, AD Richmond and Tactical Fleet)**

209.    Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

210.    As set forth in detail above, after the expiration of the initial terms of the Franchise Agreements, Auto Driveaway and AD Richmond operated under a month to month implied in fact contract that incorporated the same terms and conditions as the Franchise Agreements until September 29, 2018.

211.    As set forth in detail above, Defendants AD Richmond and Corbett have breached the terms on the implied in fact Franchise Agreements by a) misusing Auto Driveaway's Marks and Auto Driveaway System; b) violating the Standards of Operation; c) disclosing Confidential Information, d) competing with the Franchisor prior to termination of the Franchise Agreements; e) failing to disclose New Concepts to the Franchisor and failing to turn over such New Concepts to the Franchisor; f) failing to obtain signature of Bound Parties to non-disclosure and non-competition agreements; g) failing to abide by post-termination obligations; and h) competing against Auto Driveaway after the termination of the Franchise Agreements.

212.    As set forth in detail above, Defendant Tactical Fleet, as the alter ego of AD Richmond, has breached the terms of the implied in fact Franchise Agreements by, among other things, a) failing to abide by post-termination obligations of the Franchise Agreements and b) competing against Auto Driveaway after the termination of the Franchise Agreements and entry of this Court's preliminary injunction.

213.    As a direct result of the conduct of Defendants AD Richmond, Corbett and Tactical Fleet's conduct, Auto Driveaway has lost and/or is imminently threatened with the loss of clients, business, and goodwill, and absent an order from the Court, such loss of clients, business, and goodwill will continue.

214.    Auto Driveaway has performed all of its obligations under the Franchise Agreements.

215.    Defendants AD Richmond's, Corbett's and Tactical Fleet's conduct has also caused, and will continue to cause, damages to Auto Driveaway.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, AD Richmond and Tactical Fleet as follows:

a) An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Marks;

b) Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c) An injunction barring Defendants from:

   i.   misusing Auto Driveaway's Trade Names, Marks and Auto Driveaway System;
   ii.  violating the Standards of Operation;
   iii. Disclosing Confidential Information,
   iv.  Competing with the Franchisor;
   v.   Failing to disclose New Concepts to the Franchisor;
   vi.  Failing to turn over such New Concepts to the Franchisor.

d) An audit of AD Richmond and Tactical Fleet pursuant to paragraph 15.6 of the Franchise Agreements;

e) A joint and several award of compensatory damages, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

f) All such other relief the Court deems just and appropriate.

## COUNT VI
### Breach of Contract – Personal Guaranty
### (Corbett)

216.    Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

217.    Defendant Corbett personally guaranteed to Auto Driveaway that he would "punctually pay and perform each and every undertaking, agreement and covenant set forth in the [Franchise Agreements]," and he agreed to be personally bound by, and personally liable for the breach of each and every provision in the Franchise Agreements.  (Exhibit H attached to the Franchise Agreements, which are attached hereto as Exhibits B, C, and D.)

218.    Defendant Jeffrey Corbett is liable and responsible for the breaches and claims set forth in this First Amended Complaint.

219.    Defendant Corbett has failed to abide by all of the covenants, representations, and agreements set forth in the Franchise Agreements.

220.    Defendant Corbett's breach of his personal guaranties to Auto Driveaway has also caused, and will continue to cause, damages to Auto Driveaway.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendant Corbett as follows:

a)  An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Marks;

b)  Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c)  An injunction barring Defendants from:

    i.   misusing Auto Driveaway's Marks and Auto Driveaway System;
    ii.  violating the Standards of Operation;
    iii. Disclosing Confidential Information,
    iv.  Competing with the Franchisor;

      v.  Failing to disclose New Concepts to the Franchisor;
      vi.  Failing to turn over such New Concepts to the Franchisor.

d) A joint and several award of compensatory damages, punitive damages, Defendants' profits, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

e) All such other relief the Court deems just and appropriate.

**COUNT VII**
**Tortious Interference with Prospective Business Opportunity**
**(All Defendants)**

221. Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

222. Auto Driveaway and/or the franchisees perform various services related to shipping vehicles for various individuals and entities.

223. In many instances, Plaintiff Auto Driveaway and/or its franchisees have been servicing the same customers for a significant period of time.

224. As set forth in detail above, Defendant Tactical Fleet is the alter ego of AD Richmond.

225. Defendants are aware that Plaintiff Auto Driveaway has these business expectancies and relationships with its customers.

226. Defendants are competing with Plaintiff Auto Driveaway in violation of the Franchise Agreements.

227. Defendants intend to cause a breach of those relationships Auto Driveaway has or had with its customers.

228. There is no justification for Defendants' blatant disregard and interference with Plaintiff Auto Driveaway's business expectancies with its customers.

229. Defendants' intentional and willful interference with Auto Driveaway's business expectancies with its customers has resulted in damages to Auto Driveaway.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendant Corbett, InnovAuto, AD Richmond and Tactical Fleet as follows:

a) An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Marks in communications with Auto Driveaway customers;

b) Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c) An injunction barring Defendants from continued interference with Auto Driveaway customer relationships;

d) A joint and several award of compensatory damages, punitive damages, Defendants' profits, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

e) All such other relief the Court deems just and appropriate.

## <u>COUNT VIII</u>
### Declaratory Judgment That Auto Driveaway Owns Technology
### (All Defendants)

230. Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth here.

231. Pursuant to paragraph 12.5 of the Franchise Agreements, Defendants AD Richmond and Corbett agreed as follows:

> You shall disclose to us prior to executing this Agreement all copyrighted or other pre-existing materials to which you claim ownership or any other rights. You shall fully and promptly disclose to us all ideas, concepts, methods, and techniques relating to the development and/or operation of the Franchise conceived or developed by you and/or your Affiliates or employees during the term of this Agreement. All such materials created or conceived by you or in collaboration with others during the term of this Agreement shall be [Auto Driveaway's] sole and exclusive property without further consideration to you. You agree to execute any documentation necessary to perfect our ownership rights, including, without limitation, copyright, trademark, and patent applications, assignments, and/or recordings as we may request.

(Exhibits B, C, and D at ¶ 12.5.)

232.    Defendants AD Richmond and Corbett have breached and continue to breach this provision by attempting to keep, market, and sell the Unauthorized App.  Defendants AD Richmond and Corbett knowingly commissioned the very same developer who was working on the AD Driver 360 mobile application to create the Unauthorized App for Defendant InnovAuto during the terms of the Franchise Agreements.  In those Agreements, Defendants AD Richmond and Corbett agreed that the Unauthorized App is the sole and exclusive property of Auto Driveaway.

233.    Indeed, Defendants AD Richmond and Corbett retained the developer for the Unauthorized App for InnovAuto while they were assisting Auto Driveaway with updating the AD Driver 360 mobile application.  Defendants retained the same company and the same employee developer to create the Unauthorized App.

234.    As a direct result of Defendants' conduct, Auto Driveaway will be irreparably damaged if Defendants are allowed to use, market, and sell the Unauthorized App.

235.    Plaintiff Auto Driveaway has performed all of its obligations under the Franchise Agreements.

236.    Defendants' conduct has caused, and will continue to cause, damages to Auto Driveaway.

237.    Plaintiff Auto Driveaway's interest in the Unauthorized App, created based upon Auto Driveaway proprietary software and know-how, is far greater than Defendants Corbett or AD Richmond's alleged interest; and Defendant InnovAuto is merely an alter-ego for Defendant Corbett and has no rights in the Unauthorized App.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendant Corbett, InnovAuto, and AD Richmond as follows:

a) An order declaring that Auto Driveaway owns all right, title, and interest in and to the Unauthorized App, any related technology, materials, source code, notes, and any other materials or concepts conceived or created during the term of the Franchise Agreements; and

b) All such other relief the Court deems just and appropriate.

## COUNT IX
### Equitable Accounting
### (InnovAuto, AD Richmond and Tactical Fleet)

238.    Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth herein.

239.    Plaintiff Auto Driveaway requires discovery to determine, among other things, the profits that InnovAuto, Tactical Fleet and or AD Richmond have earned as a result of the use of Auto Driveaway's trademarks and or confidential information.

240.    Auto Driveaway is entitled to a portion of InnovAuto's, Tactical Fleet's and/or AD Richmond's profits, but does not have access to information regarding those profits.

241.    Auto Driveaway does not have an adequate remedy at law. Auto Driveaway does not have any means of determining the amount of damages to which it is entitled absent an accounting of InnovAuto's, Tactical Fleet's and AD Richmond's financial records and books.

WHEREFORE, Plaintiff Auto Driveaway respectfully prays that this Court order an equitable accounting of InnovAuto, Tactical Fleet and AD Richmond, enter costs in favor of Plaintiff Auto Driveaway and any further relief this Court deems just and proper.

## COUNT X (In The Alternative to Count V)
### Breach of Contract – Nashville Franchise Agreement
### (Corbett, AD Richmond and Tactical Fleet)

242.     Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth herein.

243.     In the event that this Court finds that the Franchise Agreements were not extended after the expiration of their initial term on a month-to-month basis under implied in fact Franchise Agreements, then the Nashville Franchise Agreement expired on January 31, 2018.

244.     As set forth in detail above, Defendant AD Richmond, Corbett and Tactical Fleet have breached the Nashville Franchise Agreement by a) misusing Auto Driveaway's Trade Name, Marks and Auto Driveaway System; b) violating the Standards of Operation; c) disclosing Confidential Information, d) competing with the Franchisor prior to termination of the Franchise Agreements; e) failing to disclose New Concepts to the Franchisor and failing to turn over such New Concepts to the Franchisor; f) failing to obtain signatures of Bound Parties to non-disclosure and non-competition agreements; g) failing to abide by post-termination obligations; and h) competing against Auto Driveaway after the termination of the Franchise Agreements.

245.     Defendant Tactical Fleet is the alter ego of AD Richmond.

246.     As a direct result of Defendant AD Richmond, Corbett and Tactical Fleet's conduct, Auto Driveaway has lost and/or is imminently threatened with the loss of clients, business, and goodwill, and absent an order from the Court, such clients, business, and goodwill will continue.

247.     Auto Driveaway has performed all of its obligations under the Nashville Franchise Agreements.

248.     Defendants AD Richmond's, Corbett's and Tactical Fleet's conduct has also caused, and will continue to cause, damages to Auto Driveaway.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, AD Richmond and Tactical Fleet as follows:

a)  An injunction barring Defendants from directly or indirectly misusing the Auto Driveaway Marks;

b)  Impounding of all infringing materials made or used in violation of the Franchise Agreements;

c)  An injunction barring Defendants from:

    i.  misusing Auto Driveaway's Marks and Auto Driveaway System;
    ii.  violating the Standards of Operation;
    iii.  Disclosing Confidential Information,
    iv.  Competing with the Franchisor;
    v.  Failing to disclose New Concepts to the Franchisor;
    vi.  Failing to turn over such New Concepts to the Franchisor

d)  An audit of AD Richmond and Tactical Fleet pursuant to paragraph 15.6 of the Franchise Agreements

e)  A joint and several award of compensatory damages, interest, Auto Driveaway's costs and reasonable attorneys' fees; and

f)  All such other relief the Court deems just and appropriate.

## COUNT XI
### Illinois Uniform Fraudulent Transfer Act
### (Against AD Richmond, Tactical Fleet, Corbett and Warhurst)

249.  Plaintiff Auto Driveaway incorporates the prior paragraphs 1-155 as if fully set forth herein.

250.  Defendant Warhurst is, and was at all relevant times, a citizen of Virginia. Warhurst is the Chief Human Resources Officer of Defendant AD Richmond, President of Tactical Fleet, and majority member of Tactical Fleet.

251.  Corbett is married to Warhurst.

252.  At all relevant times, AD Richmond maintained numerous financial accounts at Union Bank ("AD Richmond Union Bank Accounts").

253.    At all relevant times, Corbett and Warhurst had authority to withdraw money out of and write checks from the AD Richmond Union Bank Accounts.

254.    In June of 2018, AD Richmond stopped making the payments to Auto Driveaway as required under the Franchise Agreements.

255.    Pursuant to the terms of the Franchise Agreements, upon termination of the Franchise Agreements, AD Richmond was to immediately pay Auto Driveaway all sums that were due and owing to it.  (Dkt. 86-2, 86-3 and 101, § 15.3).

256.    Auto Driveaway terminated the AD Richmond franchises effective September 29, 2018, and purportedly AD Richmond ceased doing business on or about that date.

257.    On September 29, 2018, the date that the AD Richmond franchises were terminated, AD Richmond owed approximately $2,100,000 to Auto Driveaway.

258.    AD Richmond never paid Auto Driveaway the amounts that are due to it.

259.    Instead, Corbett and Warhurst, in an effort to avoid paying Auto Driveaway the monies that it is owed, began transferring money out of the AD Richmond Union Bank Accounts to Corbett, Tactical Fleet, and others without receiving anything of value in exchange for such transfers.

260.    Corbett withdrew monies directly from the AD Richmond Union Bank Accounts for his own use.

261.    In addition, Warhurst wrote checks to Corbett from the AD Richmond Union Bank Accounts for his own use.

262.    Between October 2018 and March 2019, the value of the checks written by Warhurst to Corbett from the AD Richmond Bank Accounts exceeded $300,000 ("Corbett Transfers").

263.     AD Richmond did not receive anything of value in exchange for the Corbett Transfers.

264.     On or before September 18, 2018, Corbett and or Warhurst established a checking account at Union Bank for Tactical Fleet ("Tactical Fleet Union Bank Account").

265.     On or before October of 2018 and continuing through at least April of 2019, Corbett and or Warhurst caused over $300,000 to be transferred from the AD Richmond Union Bank Accounts to the Tactical Fleet Union Bank Account ("Tactical Fleet Transfers").

266.     The Tactical Fleet Transfers were used to fund the operations of Tactical Fleet, including, but not limited to, paying the salaries of the Tactical Fleet employees, paying for the development of the QuarterMaster application and paying for a lease in California, among other things.

267.     AD Richmond did not receive anything of value in exchange for the Tactical Fleet Transfers.

268.     At the time that Corbett and or Warhurst made the Corbett Transfers and the Tactical Fleet Transfers, Corbett and Warhurst were aware that Auto Driveaway claimed that it was owed approximately $2,100,000 after credits and set off from AD Richmond.

269.     Corbett and or Warhurst intentionally caused the Corbett Transfers and Tactical Fleet Transfers to be made to move the money from the AD Richmond Union Bank Accounts so that Auto Driveaway would not be able to collect on any judgment.

270.     Corbett and Warhurst were aware that as a result of the Corbett Transfers and Tactical Fleet Transfers, AD Richmond would be unable to pay its debts.

271.     Section 5 of the Illinois Uniform Fraudulent Transfer Act provides in part as follows:

(a) *A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:*

(1) *with actual intent to hinder, delay, or defraud any creditor of the debtor; or*

(b) *In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:*

(1) *the transfer or obligation was to an insider;*

(2) *the debtor retained possession or control of the property transferred after the transfer;*

(3) *the transfer or obligation was disclosed or concealed;*

(4) *before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;*

(5) *the transfer was of substantially all the debtor's assets;*

(6) *the debtor absconded;*

(7) *the debtor removed or concealed assets;*

(9) *the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;*

(10) *the transfer occurred shortly before or shortly after a substantial debt was incurred;*

272.    Section 6 of the Illinois Uniform Fraudulent Transfer Act provides:

(a) *A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.*

273.    The transfers made by Corbett and Warhurst to Corbett and Tactical Fleet constitute a pattern of fraudulent conveyances under the Illinois Fraudulent Transfer Act because:

(a) They were made with actual intent to hinder, delay, or defraud Auto Driveaway;

(b) They were made to "insiders" as defined in 740 ILCS 160/2(b)(1)(A);

(c) Prior to the transfers to Corbett, AD Richmond and Tactical Fleet had been sued;

(d) Prior to the transfers to Corbett and Tactical Fleet, Corbett and Warhurst were aware that AD Richmond owed Auto Driveaway in excess of $2,000,000;

(e) The transfers to Corbett and Tactical Fleet were of all or substantially all of AD Richmond's assets leaving it unable to pay its debt to Auto Driveaway;

(f) AD Richmond did not receive any consideration or reasonably equivalent value for its transfers to Corbett and Tactical Fleet;

(g) AD Richmond was insolvent at the time the transfers were made by Corbett and Warhurst to Corbett and Tactical Fleet;

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett, AD Richmond, Tactical Fleet, and Warhurst as follows:

a) Avoiding the transfers to Corbett and Tactical Fleet;

b) Against Corbett in the amount of the transfers made to himself and Tactical Fleet;

c) Against Warhurst in the amount of the transfers made to Corbett and Tactical Fleet;

d) Order that Corbett, Warhurst, and Tactical Fleet return the funds to AD Richmond that were transferred from AD Richmond;

e) Punitive damages in an amount to be established at trial;

f) Costs; and

g) All such other relief the Court deems just and appropriate

**COUNT XII**
**Civil Conspiracy**
**(Against Corbett and Warhurst)**

274.    Plaintiff Auto Driveaway incorporates the prior paragraphs 249-273 of Count XI as if fully set forth herein.

275.    Corbett and Warhurst entered into an agreement to transfer money out of AD Richmond as part of a scheme to defraud, hinder, or delay Auto Driveaway.

276.    Corbett and Warhurst knowingly and voluntarily entered into an agreement to transfer money out of AD Richmond as part of a scheme to defraud, hinder or delay Auto Driveaway.

277.    Corbett and Warhurst knowingly and voluntarily made the Corbett Transfers and Tactical Fleet Transfers as part of a scheme to defraud, hinder, or delay Auto Driveaway.

278.    Corbett and Warhurst worked in concert to defraud, hinder or delay Auto Driveaway of the ability to collect against AD Richmond.

279.    Corbett and Warhurst engaged in a civil conspiracy to defraud, hinder or delay Auto Driveaway.

WHEREFORE, Auto Driveaway respectfully requests a judgment in favor of Auto Driveaway and against Defendants Corbett and Warhurst as follows:

a)  Against Corbett in the amount of the transfers made to himself and Tactical Fleet;

b)  Against Warhurst in the amount of the transfers made to Corbett and Tactical Fleet;

c)  Punitive damages in an amount to be established at trial;

d)  Costs; and

e)  All such other relief the Court deems just and appropriate

Dated: November 7, 2019                    GREENSFELDER, HEMKER, & GALE, P.C.

By:  /s/ Thadford A. Felton
        Kara Cenar, ARDC No. 6198864

kcenar@greensfelder.com
Susan Meyer, ARDC No. 6226450
smeyer@greensfelder.com
Thadford A. Felton, ARDC No. 6224896
taf@greensfelder.com
Dawn Johnson, ARDC No. 6216582
dmj@greensfelder.com
David Simmons, ARDC No. 6279420
ds@greensfelder.com
200 West Madison Street
Suite 3300
Chicago, IL 60606
Telephone: 312-419-9090
Fax: 312-419-1930

*Attorneys for Plaintiff Auto Driveaway Franchise Systems, LLC*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on November 7th, 2019 a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will automatically notify and serve all parties of record by electronic mail.

/s/ Thadford A. Felton
Thadford A. Felton